Filed 2/9/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| SIMONA WILSON, | B249714 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YC065545) |
| v. | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Stuart M. Rice, Judge. Reversed and remanded.

Southern California Edison Company, Patricia A. Cirucci, Brian A. Cardoza, Carla M. Blanc; Lim, Ruger & Kim, Christopher Kim, Sandra Sakamoto, Arnold Barba, Julie Kwun; Greines, Martin, Stein & Richland, Timothy T. Coates, Meehan Rasch and Robin Meadow for Defendant and Appellant.

Grassini, Wrinkle & Johnson and Roland Wrinkle for Plaintiff and Respondent.

Defendant Southern California Edison Company (Edison) appeals from a judgment following a jury trial in which the jury found in favor of plaintiff Simona Wilson on her claims for intentional infliction of emotional distress (IIED), negligence, and nuisance, and awarded her $1,050,000 in compensatory damages and $3 million in punitive damages. All of her claims are based upon her allegation that Edison failed to properly supervise, secure, operate, maintain, or control the electrical substation next door to plaintiff's house (the Topaz substation), allowing uncontrolled stray electrical currents to enter the home. Stray current (or stray voltage) is the unavoidable byproduct of grounding an electrical system.

The gas company found stray voltage on Wilson's gas meter the year after she moved into the house, and again two years later. Edison paid for certain measures taken by the gas company, which virtually eliminated the voltage on the meter. After Wilson remodeled her master bathroom (four years after she moved into the house), she began to feel low levels of electricity in her shower, because the shower had metal pipes and the drain was connected to the ground, which allowed the stray electricity to flow when someone touched the shower while in contact with the drain. Edison offered to replace all or a portion of the metal pipes with plastic, which would eliminate the voltage in her shower, but Wilson refused the offer and insisted that Edison eliminate all stray voltage on her property. She subsequently filed the instant lawsuit.

Edison contends that Wilson's claims fall under the exclusive jurisdiction of the California Public Utilities Commission (the commission or PUC), that no substantial evidence supports her claims, that the damages award is excessive, and that punitive damages were unjustified. We conclude that the PUC has not exercised its authority to adopt a policy regarding the issues in this lawsuit, and therefore it does not have exclusive jurisdiction over Wilson's claims. But we also

2

conclude that Wilson failed to present sufficient evidence to support her IIED and negligence claims, or to support an award of punitive damages. Finally, we conclude the verdict on the nuisance claim cannot stand because the trial court refused to give Edison's proffered instruction regarding causation of Wilson's physical symptoms, and therefore the jury relied upon irrelevant evidence when determining that claim. Accordingly, we reverse the judgment, order judgment entered in favor of Edison on the IIED and negligence claims, and remand to the trial court for a retrial on the nuisance claim.

## BACKGROUND

A.    *Fundamentals of Electrical Distribution Systems and Electricity*

Analysis of the facts and issues in this case requires a basic understanding of electricity and electrical distribution systems.

Electricity is produced at a generating plant. Because it is not economical to send electricity over long distances at low voltages, the electricity produced at the plant is stepped up through transformers to a very high voltage before it is sent out over transmission lines. A substation, such as Edison's Topaz substation at issue in this case, receives the high voltage electricity from the generating plant and steps it down through transformers to 4,000 volts. It then sends the electricity over distribution lines out to the neighborhood power poles, where an additional transformer steps down the voltage to 240/120 volts before delivering the electricity to homes or businesses.

In order for electricity to flow, there must be a complete circuit. In other words, when electricity is sent out from a transformer to a "load" (i.e., something that is using electricity, such as a light or appliance), it must have a return path. Typically, electricity is sent over one conductor (wire), called the "hot," and returns on another conductor called the neutral. The flow of electricity is referred

3

to as "current" and is measured in amperes (or amps); voltage is the pressure that drives the current. The amount of current depends in part upon the amount of resistance in the circuit; e.g., a 100-watt lightbulb has less resistance than a 60-watt lightbulb, so there will be a larger current flowing through it (and therefore the bulb burns brighter).[1]

For safety reasons, electrical systems usually are grounded. That means that at various points in the system, including at the substation, a connection is made from the neutral to the ground, i.e., the earth. Because the earth is conductive, it can provide a return path for the flow of electricity. Therefore, if, for example, an energized wire fell to the ground from the distribution lines, the earth would provide a path for the current to return to the substation, where a protective device would break the circuit. But the conductivity of the earth also can present a danger to someone who touches a source of electricity. If that person is in physical contact with the earth, electricity will flow from the electrical source, through his or her body, to the earth and on to the distribution system or substation, thus completing the circuit. The amount of current will depend on the resistance of the person's body, the amount of contact area, and the amount of voltage present.

In a grounded electrical system, there will always be some current flowing back to the substation through the earth. This is referred to as neutral-to-earth voltage, or NEV, and it cannot be entirely eliminated. NEV is one cause of "stray voltage," which is voltage of 10 volts or less appearing on objects, that are not part of an electrical system, that can be simultaneously contacted by members of the

---

[1]    The amount of current also depends on the amount of voltage. The amount of current is calculated using Ohm's Law: current (in amps) equals voltage (volts) divided by resistance (ohms).

4

general public.[2]  Metal objects, such as water pipes or gas lines, that are buried in or connected to the earth will conduct electricity, so if a person in a home touched a water pipe that was energized due to NEV while also touching the earth or another conductor at a different voltage, a circuit would be completed and current would run through that person's body.  This "touch potential" can be eliminated by replacing metal pipes with plastic pipes or installing isolators (such as a short section of plastic pipe) to stop the flow of electricity onto metal fixtures, or by connecting (or "bonding") the two conductors to equalize the voltage between the two.

The physiological effects of current flowing through a person's body depends upon the amount of the current.  According to a leading reference, a woman who encounters a current of 0.3 milliamps (mA) would not feel anything. At 0.7mA, she would feel a slight tingling; that typically is the perception threshold.  At 1.2mA, she would feel a shock, but it would not be painful and muscular control would not be lost.  She would feel a painful shock at 6mA, but she would still have muscular control.  The let-go threshold is at 10.5mA, and at 15mA, she would feel a severe shock, have muscular contractions, and her breathing could be difficult.[3]  Administration of currents on patients often is used

---

[2]   Stray voltage also can be caused by wiring faults (i.e., a short circuit in which an energized conductor makes contact with a grounded surface) or corrosion of a neutral conductor.

[3]   These current figures are for 60-Hz, alternating current, like the electricity supplied to homes.  Another leading reference chart, which takes into account the amount of time of the contact, shows that perception is possible up to 0.5mA, and that current above 10mA likely would produce involuntary muscle contractions, but there usually would not be any harmful physiological effects.

by physicians to determine whether they have nerve damage; they typically administer currents of 20 to 50mA, and can administer up to 120mA.**4**

B.      *History of the Property*

The house at issue in this case is located at 904 Knob Hill Drive in Redondo Beach, next door to Edison's Topaz substation. Edison owned the house until 1999.

1.      <u>1995-1997</u>

In 1995, Edison rented the house to the Pantucci family. Before renting the house to the Pantuccis, a corporate real estate agent from Edison asked Edison's facilities manager to take a look at the electrical system because a previous tenant had complained that she got a shock in the kitchen from the sink or refrigerator.

Edison hired an electrical contractor, Precision Electric, to go through the electrical panels and the house to make sure everything was in order. Precision Electric took voltage readings by the sink to the ground, and found no voltage. The contractor replaced a ground clamp and went through the entire house, but did not find any electrical problems. The contractor was called back to the house after another Edison agent touched the dishwasher door while standing in water (the dishwasher had leaked) and felt a shock. When Precision Electric checked the dishwasher, the water was gone, and there was no voltage between the dishwasher and a tack strip on the floor. The contractor told Edison the shock could have been

---

**4**      It is not clear if these applications involve alternating current or direct current. For direct current, the perception threshold is from 3.5mA to 5.2mA; a person would feel a shock (not painful) at 6mA to 9mA, and a painful shock at 41mA to 62mA; the let go threshold is at 51mA to 76mA; and the person would feel a painful and severe shock, with muscular contractions and difficulty breathing at 60mA to 90mA.

caused by the power feed to the dishwasher being in water when the dishwasher leaked.

Soon after the Pantuccis moved into the house, they began to experience shocks in the bathtub, at the washing machine, in a kiddie pool in the backyard, and at other places around the house. The shocks were mild, and no one was hurt. The Pantuccis complained to Edison a couple of times, and Edison sent people several times to try to fix the problem, but it never got fixed.

In April 1997, Edison's lease administrator, Tina Drebushenko (now Van Breukelen) emailed several Edison employees regarding some calls she recently received from Ms. Pantucci about shocks she received when touching faucets. Ms. Pantucci also told her that the family no longer used the bathtub. Drebushenko reported that "[t]his problem was supposed to have been corrected some time ago, but the tenants report that it never really was . . . they just put up with it and stopped calling." She said that Ms. Pantucci told her that the shocks were getting stronger, so Precision Electric was sent to the house. The electrician who went there detected some stray voltage, and also believed there was faulty wiring somewhere in the electrical system. Precision Electric asked for an Edison troubleshooting team to meet it at the house the following week "to rule out any substation problems." When Ms. Pantucci called the next day to report that the problem had gotten worse after Precision Electric left, Drebushenko contacted Precision Electric and the troubleshooting team to have them meet at the house that same day.

In her email to her colleagues, Drebushenko emphasized that Edison needed to "get this matter resolved once and for all or determine if it can[']t be solved." She stated that she had submitted the property to be released for sale, but that Edison might want it as a buffer. She said that if Edison could sell the property, it

would first have to fix the problem, but if the problem cannot be fixed, Edison should consider demolishing the structure.

The Pantuccis moved out a few months later, in September or October of 1997.

### 2.     1998

In January 1998, Mark Raidy was preparing the house for possible sale.  He met with several Edison employees at the house to try to determine the source of the shocks and find a solution to fix the problem.  They opened the main circuit breaker (i.e., shut off power to the house) and took readings.  They found two amps flowing in the service drop (i.e., wire) from the backyard pole to the house.  They took readings on the water pipe into the house and out to the sprinklers in the backyard, and found no current.  They agreed that the other likely path for the current was the sewer pipe, and determined they should replace the sewer pipe with plastic.  Once the sewer pipe was replaced, they would meet again, and have a troubleman there to perform a test.

They also found stray voltage inside the house.  They took a reading, and found over five volts from the damp carpet/tack strip between the kitchen and dining area and the ground on a kitchen outlet.  They agreed to do more troubleshooting at their next meeting.  In an email to the meeting participants, Raidy told them:  "If we can solve these problems and feel comfortable that they won't recur, we will proceed to market the home.  If constant maintenance is needed to prevent the re-occurrence of the problem, we should probably retain the property so we can control the maintenance.  If we can't solve the problem, we should not allow the property to be inhabited."

8

Sometime later, Edison found there was a problem on a distribution pole up the street from the house. When the problem was fixed, the stray voltage at the house stopped.

In June 1998, Raidy made a site visit at the house with Edison's sales and leasing manager, Charles Kraushaar. Raidy told Kraushaar about the reports by prior tenants of shocks at the property. He said that Edison had determined that the source of the shocks was a faulty transformer on a distribution pole up the street; the transformer was replaced, which eliminated the problem. Kraushaar touched the faucet and showerheads that previously had produced shocks to verify there were no more shocks. Kraushaar had no concern about stray voltage at the site, and authorized the release of the property for sale.

### 3. 1999-2008

Edison sold the house to the Ozerans in 1999. Edison did not receive any reports of shocks at the house for the next five years. In 2004, the Ozerans complained to Edison that the tenants of the house were getting shocked in the laundry room in the garage, in the yard at the hose bibs, and in one of the bathrooms. Edison employee Matthew Norwalk was asked to investigate as part of a team that included people from Edison's substation, field engineering, and power quality departments. Norwalk performed voltage measurements, and found voltages ranging from 11 to 15 volts inside and outside the house.[5] The team investigated the design and integrity of all connections on the distribution system, wiring within the home, and connections and design of the substation, and performed modeling of substation grounding.

---

[5] Those measurements were taken without a resistor in the line, which was standard practice at the time. In 2009-2010, the industry determined that a standard burden resistor should be used to ensure consistency.

Thousands of man-hours were spent by members of the team and others, trying to determine the source of the problem. They de-energized and inspected each circuit at Topaz to see if there were issues with any of the circuits. Ultimately, they found and replaced some corroded connectors, and determined after a ground study that the grounding of the system could be improved. They concluded, based on modeling, that the voltage around the substation could be equalized to bring down the difference in voltage between the house's ground and the waterlines on the property by adding a common neutral.[6]

The common neutral plan was implemented in February 2005. Afterwards, the Edison team performed voltage measurements at the house, and found the voltage had dropped to approximately 3.5 volts (without a resistor). Using a 1,000 ohm resistor to replicate the internal resistance of a human body, the Edison team determined that a voltage of 3.5 volts would not produce any harmful level of current (the level of current would be approximately 3.5mA). Norwalk spoke with the tenants of the house, and they were satisfied with the results. Edison received no more complaints of shocks or stray voltage until 2008.[7]

---

[6] In a common neutral system, a jumper is placed between the primary neutral (the neutral wire coming from the substation on the distribution poles) and the secondary neutral (the neutral wire used to supply the individual homes from the transformer on the distribution pole). By connecting these neutrals, Edison utilizes the grounding systems of all surrounding homes as well as the grounds installed for the transformer itself.

[7] The Ozerans sold the house sometime after July 2005 to the Boekers. In preparation for the sale, Dr. Ozeran asked Edison for a letter to give to the buyer confirming that the voltage levels were safe. Edison wrote that letter, and confirmed that the level of current was 3.5mA, which is below the safety threshold of 5mA used by Underwriter's Laboratory, and would not pose a safety hazard.

C.    *Events Leading Up To Present Lawsuit*

Wilson bought the property in March 2007 and moved in with her husband, Ryan Fisher, and son.[8]  She asked the previous owner whether there were any safety hazards in the home with respect to the substation next door, and was told there had been no problems.  Neither she nor Fisher was aware of any voltage problem with the house until August 2008.


1.    Voltage on the Gas Meter

When Fisher came home from work on August 22, 2008, he found tags from the gas company saying that it had found a dangerous condition; there was electricity (measured at 7 volts) detected at the gas meter.[9]  The tags indicated that the gas had been turned off, and Fisher was advised to call the electric company.

In response to Fisher's call, Norwalk came to the house and took a voltage measurement on the gas pipe entering the property.  He measured 1.8 volts without a resistor.  Norwalk told the gas company that the source of the voltage appeared to be NEV, and that Edison would investigate to see if it could be further reduced.  Edison tested the effect of removing the common neutral, and discovered that the voltage on the meter went down when they disconnected it but the voltage from the hose bib to the ground went up to 8 volts, so they restored the common neutral.  Generally, when the source of voltage at a gas meter is NEV, the gas company will accept that voltage level.  To verify that the source of the voltage was NEV, Edison

---

[8]    She was pregnant with her second son when she moved in; he was born a few months later.  Her husband moved out of the house in March 2009, and she and her husband divorced in April 2010.

[9]    Employees of Southern California Gas Company are directed to shut off the gas and notify a supervisor if they find any electricity at a gas meter; a higher skilled person then goes to the location and measures the current.

11

placed a device on the gas meter to record the voltage to see if the voltage trended the load on the substation. Upon learning that Edison was monitoring the voltage, the gas company restored service to the house. Edison ultimately determined that the voltage changed in direct relationship to the loading of the substation, which confirmed that the source of the voltage was NEV.

The gas company notified Wilson again in April 2010 that it had detected electricity on the gas meter, although it did not turn off the gas at that time. The gas company also found voltage on the gas lines of other homes and facilities in the area. Representatives from the gas company had several meetings with representatives from Edison to try to find a way to address the problem. Ultimately, it was determined that the best way to eliminate voltages on the gas lines and meters was to install isolators on the gas service lines to the customers' homes. Edison paid several thousand dollars for the installation of isolators, which was completed in 2012 and reduced the voltage on the gas meters to less than one volt.[10]

### 2. Voltage in the Shower

In the meantime, in March 2011, Wilson remodeled her master bathroom. The construction was done to code by Wilson's father, who was a contractor. As part of the remodel, Wilson replaced an elevated bathtub with a shower that had a metal drain in the concrete on the floor, so it had contact with the earth.[11] After the remodel, Wilson began feeling a "tingling sensation" while she was showering, but

---

[10]    The gas company subsequently replaced the main gas pipeline with a plastic gas main.

[11]    When the house was inspected after Wilson filed her lawsuit, all of the plumbing in the house used plastic plumbing except for the master bathroom shower and an outside shower that was installed at the time of the remodel.

she thought it was a pinched nerve. On the evening of April 19, Wilson told her boyfriend, Jason Stelle, that she was "feeling some kind of tingling" while showering. Stelle got in the shower to adjust the showerhead and "started feeling a tingling sensation as well." After touching the showerhead a few more times, he realized that the sensation was not from his body, but was from the fixture. He touched it numerous times that evening and the next day to confirm there was a sensation before calling an electrician.

Wilson's father and the electrician came to the house on April 20 and took voltage readings. They found voltage on the pipe leading to the showerhead. They started looking for the cause, eventually turning off all the power to the house, and found there still was voltage. The electrician and Stelle called Edison.

An Edison field technician came to the house a few days later and took voltage readings in the shower and other areas of the house. The technician told Stelle that there had been a history of problems with the house, and that there was not much he could do other than check to make sure it was not something that could be immediately fixed. He did not explain what the problems were. Another Edison representative came by later that day and did a similar walk-through and took voltage readings.

About a week later, Norwalk came to the house and met with Stelle. At Stelle's request, Norwalk took voltage measurements at the master shower and at the gas meter. The voltage at the shower was 2.2 volts with a 500 ohm resistor and 2.4 volts without the resistor; the readings at the gas meter were 0.5 volts with the resistor and 1.7 without. Norwalk tried to explain the cause of the voltage; as Stelle understood Norwalk's explanation, the substation was causing a voltage potential across the property that was within Edison's standards, and Edison did not have plans to do anything about it. Stelle asked Norwalk to come back to the house on May 6 to meet with Wilson and explain it to her.

13

On May 6, Norwalk and two other Edison representatives (including Bill Stone, a claims representative) met at the house with Wilson, Stelle, Wilson's father, and her electrician. Norwalk measured the voltage on the shower, and showed the group that it measured 2.4 volts without the resistor and 2.2 volts with the resistor. They then went to the gas meter, where Wilson's electrician said he had measured 11 volts.[12] The electrician had not used a resistor when taking that measurement. Using the electrician's meter, with the probes exactly where he placed them, Norwalk added a resistor to see what the true value was. The voltage was reduced to nearly zero. Norwalk next took voltage readings in the hallway bathroom that was used by the children. He measured from the drain grate in the bathtub to the shower controls. Although he found some voltage without the resistor, the voltage bled to zero when the resistor was added.[13]

The group returned to the kitchen, where Norwalk showed Wilson the data from the voltage monitor that had been placed on her gas meter. He showed her that the voltage was lower in the morning and higher at night, in direct relationship to the substation, and explained the same is probably true in her shower. He estimated that the voltage in the shower in the evening would be around 3 volts. He noted there was missing data from December 2010 to April 2011, because the data card on the monitor had filled up, but explained that the voltages recorded

---

[12]    The electrician showed Norwalk that he measured the voltage by inserting one probe in the dirt next to the substation, outside the home's property line, and touched the other probe to the gas line entering the home. According to Norwalk, this is not the correct way to measure the voltage because there is no touch potential between those two points, i.e., a person cannot be standing on the dirt next to the substation while touching the gas line at the house.

[13]    Norwalk explained that the reason there was less voltage in the bathtub was because there is a rubber gasket between the drain and the sewer line, so there is no electrical connection.

before the monitor stopped recording were almost exactly the same as those recorded after the data card was replaced.

What happened next is in dispute.

According to Wilson, Norwalk advised her to shower during off-peak hours when the stray voltage was lower and to modify her house to make it less conductive. He did not make any specific recommendations as to how to modify the house, nor did he offer to have Edison do any work on her house during that meeting.[14] During her discussions with the group, Wilson told the Edison representatives that she wanted the stray voltage completely eliminated. When she tried to explain some symptoms she was having in her hands, Stone, the claims representative, turned toward her and yelled, "It's just your nerves." The meeting ended when Wilson asked for a copy of the simulation study on the stray voltage that Norwalk had told Stelle about during his prior meeting and copies of work orders showing what work had been done on the property before she bought it; Stone told her she needed to request those documents in writing.

According to Norwalk, he explained to Wilson at the meeting that the voltage in the shower could be mitigated through bonding, or by replacing a portion of the copper plumbing in the shower with a short piece of plastic piping. He told her that she could have her contractor perform the work, if that made her more comfortable, and she could submit the bill to Edison.[15] Wilson told him that

---

[14] According to Wilson, Edison did not offer to install isolators or replace the pipes in the shower until after she had hired an attorney and moved out of the home. Wilson believed that replacing the pipes with plastic pipes "would be substandard" and "just a bandaid." In any event, she testified that she would not have accepted the offer at any time, because "[t]he only thing that would be acceptable to me is to completely eliminate the stray voltage on my property."

[15] A claims investigations manager for Edison testified that he spoke by phone with Wilson a few days after the May 6 meeting and told her he understood that Edison's field personnel had determined the best way to address the voltage issue was to put a plastic

she did not want to expose her family to any more dust from construction. She became upset that Edison could not remove the voltage by doing something within the substation, and the meeting ended.

Wilson moved out of the house in September 2011, after an inspector she hired told her she should get out. The inspector was a building biologist whose expertise was in electromagnetic fields. She sold the home in January 2013.

### 3. Wilson's Symptoms

After Wilson started feeling the electricity in the shower, she started throwing up all the time, and her body felt extremely weak. She started to have muscle fatigue and muscle spasms, and her hands were shaky. She could not hold a cup of coffee or type, and had constant numbness, pain, and tingling in her hands and feet.[16] She had episodes in which her hands and feet turned red and were warm to the touch.

She went to a neurologist, Dr. Rederich, in May 2011. Dr. Rederich performed some simple tests on her, and diagnosed her with nerve damage. He prescribed pain medication, and told her the nerves would regenerate over time. When her symptoms got worse, Wilson returned to Dr. Rederich. He told her that he thought she might be developing secondary erythromelalgia, a rare condition for which there was no cure, and referred her to a specialist, Dr. Beydoun. Dr. Beydoun concluded she did not have secondary erythromelalgia or nerve damage,

---

insert into the metal plumbing. He told her that Edison would pay for the work, and put her up for a day or two while it was being done, but Wilson rejected the offer and said she wanted Edison to buy her house.

[16] Wilson testified that many of these symptoms stopped after she had a hysterectomy in January 2012.

16

but he could not rule out the possibility that she had primary erythromelalgia, which is an inherited condition.

D.    *The Present Lawsuit*

On September 11, 2011, Wilson, on her own behalf and as guardian ad litem for her children, filed a complaint for damages against Edison, the Boekers (who sold the house to her), and the Boekers' real estate agents.  We need not discuss in detail the proceedings below.  Suffice to say that the case was tried before a jury on Wilson's claims for IIED, negligence, and nuisance as alleged in the first amended complaint.  All of those claims alleged, in essence, stray voltage generated by the Topaz substation entered into Wilson's home, causing shocks to Wilson, and that Edison knew of the stray voltage from the substation, but failed to properly operate, maintain, or control the substation, and failed to maintain the safety of the residents living next to the substation.  Wilson contended at trial that any level of stray voltage on the property was unacceptable, and Edison was liable for failing to eliminate it.[17]

After an eight-day trial, the jury found in favor of Wilson on all three claims. The jury awarded Wilson $375,000 in past non-economic damages and $175,000 in future non-economic damages on her IIED and negligence claims, and $500,000

---

[17]    For example, during closing argument, Wilson's attorney highlighted the most important evidence to show Edison's liability:  "No. 1, we know that the stray voltage problem on Knob Hill is a persistent, recurrent, serious problem that was never fixed." Later, counsel told the jury:  "I can tell you that if there was a bunch of voltage on my fixtures in my home, I would not say to myself well, gee, I wonder how this registers on the IEC chart, physiological chart, or I w[o]nder what the difference in potential between my showerhead and my drain. . . .  [¶]  What I'm thinking is, there is electricity in my house, on my fixtures, that people, real human being, including my own children, are being exposed to.  And that is unacceptable."

on her nuisance claim, and found Edison liable for punitive damages. Following a punitive damages phase, the jury awarded Wilson $3 million in punitive damages.

The trial court entered judgment, and Edison timely filed motions for judgment notwithstanding the verdict and a new trial. In the motion for judgment notwithstanding the verdict, Edison argued for the first time that all of Wilson's claims were barred by Public Utilities Code[18] section 1759.[19] The trial court denied both motions, by minute order and by a signed order. Edison timely filed notices of appeal following entry of each order.

## DISCUSSION

Edison contends that Wilson's claims fall under the exclusive jurisdiction of the PUC, that no substantial evidence supports her claims, that the damages award is excessive, and that punitive damages were unjustified. We find that the PUC does not have exclusive jurisdiction over Wilson's claims, but we agree there was insufficient evidence to support her IIED and negligence claims and that the punitive damages award was unjustified. Although we reject Edison's contention that there was insufficient evidence to support the nuisance claim, we find the jury may have relied upon irrelevant evidence in considering that claim, and therefore the nuisance claim must be retried.

---

[18]    Further undesignated statutory references are to the Public Utilities Code.

[19]    Edison had argued in a motion for summary judgment that Wilson's nuisance claim was barred by section 1759, but its argument was premised on its understanding that the nuisance claim was based upon Wilson's fear of harm from electromagnetic fields.

18

A.    *Exclusive Jurisdiction of the PUC*

Section 1759 provides:  "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."  On appeal, Edison argues that Wilson's claims are barred under section 1759 by the PUC's exclusive jurisdiction over the design, siting, operation, and safety of Edison's electrical distribution system.  Wilson contends Edison waived this issue by failing to plead it as an affirmative defense in the answer or raise it by demurrer, and that, in any event, section 1759 does not apply in this case.  We conclude that the issue is one of subject matter jurisdiction that cannot be waived, but that section 1759 does not bar the trial court from litigating Wilson's claims.

1. *Whether Section 1759 Applies is an Issue of Subject Matter Jurisdiction That Cannot Be Waived*

As noted, Edison did not argue that all of Wilson's claims were barred by the PUC's exclusive jurisdiction until it filed its post-trial motion for judgment notwithstanding the verdict.  Wilson contends that Edison cannot raise exclusive jurisdiction on appeal because "[e]xclusivity is an affirmative defense . . . [that] must be pled in the defendant's Answer—or it is waived."  (Citing *Doney v. Tambouratgis* (1979) 23 Cal.3d 91 (*Doney*).)  Her reliance upon *Doney* is misplaced.

*Doney*, *supra*, 23 Cal.3d 91, and all but one of the other cases Wilson relies upon involve the exclusive remedy provision of the Workers' Compensation Act

19

(Lab. Code, § 3600 et seq.).**[20]**  That act provides, in relevant part, that "[w]here the conditions of compensation set forth in Section 3600 concur, the right to recover compensation is . . . the sole and exclusive remedy of the employee or his or her dependents against the employer" (Lab. Code, § 3602, subd. (a)), and that "[i]n all cases where the conditions of compensation set forth in Section 3600 do not concur, the liability of the employer shall be the same as if this division had not been enacted" (Lab. Code, § 3602, subd. (c)).  The legal theory supporting this exclusive remedy provision "is a presumed 'compensation bargain,' pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability.  The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16.)

As the Supreme Court explained in *Doney*, "a defendant in a civil action who claims to be one of that class of persons protected from an action at law by the provisions of the Workers' Compensation Act bears the burden of pleading and proving, as an affirmative defense to the action, the existence of the conditions of compensation set forth in the statute which are necessary to its application. [Citations.]  'The employee is pursuing a common law remedy which existed before the enactment of the statute and which continues to exist in cases not covered by the statute.  It is incumbent upon the employer to prove that the

---

**[20]**      The remaining case, *Crookall v. Davis, Punelli, Keathley & Willard* (1998) 65 Cal.App.4th 1048, is a legal malpractice case involving the law firm's failure to timely raise the defense of the antideficiency statute in a foreclosure action.  (*Id.* at p. 1056.)  It has no relevance to the exclusivity issue in this case.

Workmen's Compensation Act is a bar to the employee's ordinary remedy.' [Citation.]" (*Doney*, *supra*, 23 Cal.3d at pp. 96-97, fn. omitted.)

The Supreme Court observed that finding a defendant waived the protection of the exclusive remedy provision by failing to raise it as an affirmative defense does not "result[] in the improper 'conferral' of subject matter jurisdiction by means of consent, waiver, or estoppel . . . [because] plaintiff was 'pursuing a common law remedy which existed before the enactment of the statute and which continues to exist in cases not covered by the statute.' [Citation.] The trial court clearly had subject matter jurisdiction over such an action unless and until it was properly demonstrated that the case was one 'covered by the statute' due to the presence therein of the conditions of compensation set forth in section 3600 of the Labor Code. . . . When, as in this case, no such demonstration has been made . . . , the court properly proceeds to exercise its existing jurisdiction to enforce the common law remedy." (*Doney*, *supra*, 23 Cal.3d at pp. 98-99.)

In contrast to the workers' compensation exclusive remedy provision, which is designed to protect the employer from tort liability that otherwise could be imposed in the absence of the workers' compensation law, section 1759 is designed to protect the PUC's constitutional and statutory authority to regulate utilities. As the Supreme Court explained in *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893 (*Covalt*), "'[t]he commission is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1-6.) The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id.* §§ 2, 4, 6.)" (*Covalt*, *supra*, 13 Cal.4th at pp. 914-915.) The Constitution also gives the Legislature plenary power to confer additional authority and jurisdiction upon the commission, which the Legislature did by enacting the Public Utilities

21

Act (§ 201 et seq.). (*Covalt*, *supra*, 13 Cal.4th at p. 915.) "That law vests the commission with broad authority to 'supervise and regulate every public utility in the State' (§ 701) and grants the commission numerous specific powers for the purpose," and "further authorized the commission to '*do all things*, whether specifically designated in [the Public Utilities Act] *or in addition thereto*, which are necessary and convenient' in the exercise of its jurisdiction over public utilities. [Citation.]" (*Covalt*, *supra*, 13 Cal.4th at p. 915.)

In addition to the authority granted directly to the commission by the Constitution, "[t]he Constitution also confers plenary power on the Legislature to 'establish the manner and scope of review of commission action in a court of record' (Cal. Const., art. XII, § 5). Pursuant to this constitutional provision the Legislature enacted article 3 of chapter 9 of the Public Utilities Act, entitled 'Judicial Review,' . . . [which] prescribes a method of judicial review that is narrow in both 'manner and scope,'" limiting review of a commission decision to an action filed directly in the Supreme Court by means of a petition for writ of review.[21] (*Covalt*, *supra*, 13 Cal.4th at p. 915.) The Court noted that "the Legislature then made it clear in section 1759 of the Public Utilities Act that no other court has jurisdiction either to review or suspend the commission's decisions or to enjoin or otherwise 'interfere' with the commission's performance of its duties." (*Covalt*, *supra*, 13 Cal.4th at p. 916.)

As this discussion makes clear, section 1759 is a statute involving subject matter jurisdiction, and divests trial courts of jurisdiction to entertain lawsuits that would interfere with the PUC's regulation of utilities. Its application cannot be waived by the parties to the litigation. (See *Harrington v. Superior Court* (1924)

---

[21] Chapter 9 subsequently was amended to allow for review by the court of appeal in addition to the Supreme Court. (§ 1756.)

22

194 Cal. 185, 188 ["Jurisdiction of the subject matter cannot be given, enlarged or waived by the parties. . . . '[W]here the jurisdiction of the court as to the *subject matter* has been limited by the constitution or statute the consent of parties cannot confer jurisdiction.'"].) Indeed, a judgment entered by a court without subject matter jurisdiction is void, and may be "'attacked anywhere, directly or collaterally, by parties or by strangers.'" (*Marlow v. Campbell* (1992) 7 Cal.App.4th 921, 928; see also *Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1246 ["Subject matter jurisdiction may be raised for the first time on appeal. . . . In addition, an alleged lack of subject matter jurisdiction must be addressed whenever it comes to a court's attention."].) Therefore, Edison is not barred from asserting for the first time on appeal the trial court's lack of jurisdiction under section 1759.

2. *Section 1759 Does Not Bar Wilson's Claims*

Having concluded that section 1759 raises an issue of subject matter jurisdiction that is not waived by a party's failure to raise it in its answer or a demurrer, we must determine whether that statute bars Wilson's claims. For that we turn to *Covalt*, *supra*, 13 Cal.4th 893, in which the Supreme Court developed a three-part test to determine whether section 1759 applies.

a. The *Covalt* Test

In *Covalt*, *supra*, 13 Cal.4th 893, the Supreme Court was required to reconcile section 1759 with another provision of the Public Utilities Act, section 2106, that allowed private actions for damages against public utilities in certain circumstances. Section 2106 provides in relevant part that "[a]ny public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be

23

done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom."

The Court noted that in an earlier case in which it had been required to reconcile these two provisions for the first time, *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1 (*Waters*), it had "declared the primacy of section 1759 and the correspondingly limited role of section 2106. The [*Waters*] court held that 'in order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as *limited* to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies.'" (*Covalt*, *supra*, 13 Cal.4th at pp. 917-918, quoting *Waters*, *supra*, 12 Cal.3d at p. 4.) The *Covalt* court explained that, under the *Waters* rule, an action for damages under section 2106 "is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Covalt*, *supra*, 13 Cal.4th at p. 918.)

The *Covalt* court observed that "[t]he *Waters* rule may be further understood by considering examples of how it has been applied by our Courts of Appeal. When the bar raised against a private damages action has been a ruling of the commission on a single matter such as its approval of a tariff or a merger, the courts have tended to hold that the action would not 'hinder' a 'policy' of the commission within the meaning of *Waters* and hence may proceed. But when the relief sought would have interfered with a broad and continuing supervisory or

24

regulatory program of the commission, the courts have found such a hindrance and barred the action under section 1759." (*Covalt*, *supra*, 13 Cal.4th at pp. 918-919.)

The Court then turned to the case before it, in which the plaintiffs filed an action for damages and injunctive relief against a utility that alleged the utility's powerlines that ran on land adjacent to the plaintiffs' residence emitted "'high and unreasonably dangerous levels of electromagnetic radiation onto plaintiffs' property.'" (*Covalt*, *supra*, 13 Cal.4th at p. 911.) The Court applied the *Waters* rule by answering three questions: "The first question is whether the commission has the *authority* to adopt a policy on (1) whether electric and magnetic fields arising from the powerlines of regulated utilities are a public health risk and (2) what action, if any, the utilities should take to minimize that risk" (*id.* at p. 923); "The next question is whether the commission has *exercised* the foregoing authority to adopt a policy on powerline electric and magnetic fields" (*id.* at p. 926); "The final question is whether the present superior court action would hinder or interfere with that policy within the meaning of *Waters* [citation] and its progeny" (*id.* at p. 935).

As to the first question, the Court found that "the commission has broad authority to determine whether the service or equipment of any public utility poses any danger to the health or safety of the public, and if so, to prescribe corrective measures and order them into effect." (*Covalt*, *supra*, 13 Cal.4th at pp. 923-924.) It cited, among other things, section 761 of the Public Utilities Act, which provides "that whenever the commission finds that the 'equipment, appliances, facilities, or service of any public utility, or the methods of manufacture, distribution, transmission, storage, or supply employed by it' are 'unsafe,' it shall prescribe the equipment, appliances, facilities, or service to be provided or used by the utility, and shall further prescribe 'rules for the performance of any service or the furnishing of any commodity' by such utility" (*Covalt*, *supra*, 13 Cal.4th at p. 924,

25

quoting § 761), and section 762, which provides that "whenever the commission finds that the equipment, apparatus, or facilities of any utility should be changed or improved, or new structures be erected, in order to promote the 'security' of its employees or the public, it shall order the utility to make such changes or erect such structures." (§ 762; see *Covalt*, *supra*, 13 Cal.4th at p. 924.)

As to the next question, the Court noted that the Legislature initiated an inquiry into the potential health effects of electromagnetic fields (EMF) caused by electrical utility generating and transmission facilities, and directed the commission and the State Department of Health Services (DHS) to jointly conduct certain high-priority research projects and submit a report on the status of those research projects and recommendations, if any, for legislation to limit exposure to EMF. (*Covalt*, *supra*, 13 Cal.4th at p. 926.) The commission and DHS did so, and concluded that California should take no action at that time to regulate EMF around electric power facilities because such actions would be premature given current scientific understanding of the issue. (*Id.* at p. 927.) Subsequently, the commission issued a decision in a proceeding regarding the construction of a new transmission line by Southern California Edison Company, in which the commission ruled that although it would not adopt standards prescribing maximum allowable EMF levels or require any action to be taken to change EMF exposure levels along existing transmission lines, it would be prudent to avoid new exposure to EMF, and therefore it would require the utility to take certain steps to avoid unnecessarily exposing people to EMF. (*Id.* at p. 928.) A short time later, the commission reopened and enlarged its inquiry into the topic of EMF, and appointed an advisory panel, which issued a report to the commission recommending certain interim actions. (*Id.* at pp. 929-930.) The commission held public hearings on those recommendations and issued an interim opinion and order, and ultimately established an EMF policy for electric utility facilities and

powerlines. (*Id.* at pp. 930-931.) The Court concluded that "[t]here is no doubt that the commission is still actively pursuing the broad policy inquiry into the potential health effects of powerline electric and magnetic fields" (*id.* at p. 934), and that "the commission has exercised -- and is still exercising -- its constitutional and statutory authority to adopt a general policy on whether electric and magnetic fields arising from the powerlines of regulated utilities are a public health risk and what steps, if any, the utilities should take to minimize that risk" (*id.* at p. 935).

As to the final question, the Court concluded that most of the plaintiffs' claims failed to allege facts sufficient to state a cause of action, and the remaining claim, for nuisance, was barred by section 1759 because it would hinder or interfere with the commission's policy. Addressing the nuisance claim, the Court noted that to award damages for nuisance under a theory that EMF impaired the use and enjoyment of the property because plaintiffs feared that EMF would cause them physical harm, the trier of fact would be required to find that a reasonable person viewing the matter objectively would experience a substantial fear that EMF cause physical harm and would deem the invasion so serious that it outweighs the social utility of the utility's conduct. The Court found that those findings would be inconsistent with the commission's conclusion that the available evidence does not support a reasonable belief that the EMF in question present a substantial risk of physical harm and that regulated utilities need take no action to reduce EMF levels from existing powerlines. (*Id.* at p. 939.)

### b. Application of the *Covalt* Test

In applying the *Covalt* test to this case, Edison argues that (1) the PUC has broad authority "to regulate the design, siting, operation, and safety of electrical distribution systems"; (2) the PUC has exercised that authority by issuing regulations that "include detailed design, construction, operating, and safety

27

specifications for every possible aspect of electric distribution systems (e.g., G.O. 95 [construction of overhead systems]; G.O. 128 [construction of underground systems]; G.O. 165 [inspection requirements]; G.O. 131-D [planning and construction of electric generation, transmission and distribution facilities]; G.O. 174 [substations] . . .)"; and (3) the jury award obstructs and interferes with the PUC's regulations and policy by "imposing liability on Edison for stray voltage that results from Edison's compliance with those regulations" and "effectively finding that Edison was *required* to do something—'completely eliminate[]' stray voltage—that the PUC *does not* require."

The PUC itself offered a similar analysis in an amicus brief filed at the request of the trial court in two consolidated cases filed by Wilson's neighbors against Edison based on allegations of stray voltage in the areas surrounding the Topaz substation.[22] [23]  First, the PUC argued that the commission "has authority to adopt regulatory policies and programs regarding the design, construction,

---

[22]     The amicus brief was filed in the consolidated cases *Daniel Richmond, et al. v. Southern California Edison Company* (L.A.S.C. Case No. BC497689) and *Lori Barber, et al. v. Southern California Edison Company* (L.A.S.C. Case No. YC066729).  We granted Edison's request to take judicial notice of the amicus brief, which was filed on June 23, 2014, after Edison filed its appellant's opening brief; Edison's request was made before Wilson's respondent's brief was due.  According to the amicus brief, the consolidated cases asserted claims based upon allegations that Edison "violated Commission General Order ('GO') 95, Rule 33.2 by allowing electric current to escape from its confines using the ground as a conductor" as well as other claims related to alleged excessive EMF radiation at the Topaz substation.

[23]     We recognize that the question whether the PUC has exclusive jurisdiction is a legal question, and we are not bound by the PUC's determination.  (See, e.g., *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1195 ["[I]n deciding this issue we necessarily take into account the PUC's interpretation of the statutes it is charged to administer, mindful that the PUC's interpretation is not controlling but is accorded weight commensurate with the thoroughness, validity, and consistency of the PUC's reasoning.  The PUC's interpretation is one of 'among several tools available to the court' in determining the meaning and legal effect of a statute."].)

28

operation, and maintenance and safety of utility equipment and facilities." Next, it argued that the commission exercised its authority by "adopting various regulatory policies and programs governing the design, construction, maintenance, operation, and safety of the equipment and facilities such as those at issue in this case," noting that those policies and programs "are reflected in various Commission orders, decisions, rules, and regulations," such as the rules and requirements set forth in General Order (G.O.) 131-D, G.O. 95, and G.O. 128. In addition, the PUC noted that its "regulatory policies and programs in this area are continuing and ongoing," citing the frequent amendments to G.O. 95 and the adoption in 2012 of G.O. 174, "containing 'Rules for Electric Utility Substations.'" Finally, the PUC argued that court adjudication prior to a commission finding of wrongdoing "would interfere with the Commission's authority to interpret and apply its own orders, decisions, rules and regulations regarding the design, construction, operation, maintenance and safety of utility equipment and facilities." The commission noted that its "regulatory programs ensure, among other things, that regulated utilities will be subject to uniform requirements," and that a trial court's determination of the issues in the consolidated cases could "unintentionally result in new or inconsistent requirements regarding the design, construction, operation, maintenance, and safety of utility equipment and facilities."

In contrast to Edison's and the PUC's analysis, Wilson in her respondent's brief focuses only on the second question, and appears to argue that section 1759 applies only if "the PUC exercised its authority to specifically regulate the specific conduct for which the plaintiff sought civil damages." She contends that because there is no regulation on stray voltage, Edison fails the *Covalt* test.

We disagree with Wilson's assertion that section 1759 applies in this case only if the PUC has issued a specific regulation on stray voltage. In *Covalt*, the Court observed that under the *Waters* rule, section 1759 barred an action for

29

damages "not only when an award of damages would directly contravene a specific order or decision of the commission, . . . *but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission*, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Covalt*, *supra*, 13 Cal.4th at p. 918, italics added.) But we also disagree with Edison's (and the PUC's) assertion that the commission's adoption of various policies governing the design, construction, maintenance, operation, and safety of electrical distribution facilities is sufficient to establish the PUC's exclusive jurisdiction over the claims in this case.[24]

As Wilson correctly points out, it is not sufficient that the PUC issued general regulations requiring that electrical distribution systems be operated and maintained in a manner to ensure safety and service, and setting forth certain design requirements. Indeed, the Supreme Court in *Covalt* cited with approval *Pierce v. Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68, in which the appellate court held that section 1759 did not bar the plaintiff's action for damages caused by a defective transformer that exploded and sent 7,000 volts of electricity into house wiring designed to carry 120 volts. The Supreme Court noted the appellate court properly rejected "a contention that the superior court lacked jurisdiction under the *Waters* rule simply because a general regulation (Gen. Order No. 95) provides that electric supply systems shall be maintained in such a condition as to give 'safe' service and utilities shall 'exercise due care to reduce to

---

[24]    There can be no dispute that the PUC has the authority to adopt a policy on safety issues, including stray voltage, arising from the operation of the Topaz substation. As the Supreme Court stated in *Covalt*, "the commission has broad authority to determine whether the service or equipment of any public utility poses any danger to the health or safety of the public, and if so, to prescribe corrective measures and order them into effect." (*Covalt*, *supra*, 13 Cal.4th at pp. 923-924.)

a minimum' the hazards from overhead wires." (*Covalt*, *supra*, 13 Cal.4th at p. 945.)

Edison, however, does not solely rely upon the *general* safety and design regulations issued by the PUC. As Edison explains, those regulations specifically address grounding, including grounding requirements for common neutral systems like the Topaz system. (G.O. 95, Rules 21.4, 33.3, 58.2, 59.4.) Those regulations require that grounding be "effective" (G.O. 95, Rule 21.4) and set forth detailed minimum requirements for ground conductors (G.O. 95, Rules 33.3, 59.4). Because the PUC expressly requires that electrical distribution systems be grounded, and because (as even Wilson's expert witness testified at trial) stray voltage is an inevitable byproduct of grounding, Edison argues that Wilson's lawsuit – which imposes liability on Edison for damages resulting from this byproduct – contravenes the PUC's grounding regulations because Edison cannot comply with those regulations while also satisfying Wilson's demand that it completely eliminate stray voltage on her property.[25]

Our review of the General Orders Edison cites and the cases in which PUC exclusive jurisdiction was found lead us to conclude, however, that the *Covalt* test is not satisfied here.

First, although there is no doubt that the General Orders require grounding of substations, it may be that Edison could comply with the regulations and still mitigate the stray voltage that results from grounding. Although that is an issue that is more appropriately submitted to the PUC under the primary jurisdiction doctrine (see *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390-391 [when a claim is originally cognizable in the courts, primary jurisdiction

---

[25]    Edison notes that Wilson testified that mitigation of touch potential by bonding or installing insulators would be insufficient because the stray voltage would not be eliminated.

"'comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views'"]), it does not mean that Wilson's claims are barred under the *Covalt* test.

Second, when the PUC adopted G.O. 174, entitled "Rules for Electric Utility Substations," the commission explained why it was needed: "The Commission's current General Orders 95, 128, and 165 are already designed to promote safe operation of electric utility and communications infrastructure facilities, and provide minimum safety requirements which the utilities are to supplement with additional safety precautions when local conditions warrant. However, *these General Orders do not give guidance as to how utilities operate and maintain their substations, and there are no specific regulations governing substation operation*." (*Order Instituting Rulemaking to Implement Com. Regs. Re Safety of Electric Utility Substations* (Oct. 25, 2012) 2012 Cal. PUC LEXIS 470, *2, italics added.) G.O. 174 does not, however, contain any such regulations. Instead, the General Order requires each electric utility to establish and update an inspection program for its substations, maintain records of its inspections, and submit annual inspection program summaries and reports summarizing completed inspections to the Utilities Safety and Reliability Branch of the PUC. (G.O. 174, Rules 30, 31, 32, 33, 40.) And although the PUC ordered the utilities to meet annually to share their newly developed practices and review their own practices in light of other utilities' practices, with the expectation that "a 'best practice' will evolve that shows how to most effectively operate and safely control the electric systems in California . . . even as these practices continue to reflect the unique elements of each system" (*Order Instituting Rulemaking to Implement Com. Regs. Re Safety of Electric Utility Substations*, *supra*, 2012 Cal. PUC LEXIS 470, at p. *10), it is

unclear whether this "best practice" will address stray voltage issues. Therefore, we cannot say with any certainty that litigation of Wilson's claims would hinder or interfere with the PUC's regulatory policy.

Finally, the purported exercise of authority that Edison relies upon is of a vastly different character than the kinds of exercise of authority found in cases in which courts applied the *Waters* rule and found that section 1759 bars the plaintiff's action. In most of those cases, the PUC conducted (or was in the process of conducting) investigations into or adopted regulations on the specific issue alleged in the plaintiffs' lawsuit. (See, e.g., *Covalt*, *supra*, 13 Cal.4th 893 [plaintiffs alleged damages due to defendant's powerlines emitting EMF radiation on plaintiffs' property; PUC conducted research projects on and investigations into the potential health effects of EMF]; *Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225 [plaintiffs sought damages and injunctive relief based on a utility's alleged excessive trimming of commercially productive walnut trees located under the utility's power lines; the commission had adopted a regulation mandating minimum distances that must be maintained between conductors and vegetation, expressly declined to mandate the maximum limits of tree trimming, and left to the determination of the utility whether greater clearance were necessary under the circumstances to accomplish the purposes of the regulation]; *Brian T. v. Pacific Bell* (1989) 210 Cal.App.3d 894 [plaintiffs sought damages and injunction to compel utility to restrict access of sexually explicit materials to adults through certain methods; commission had conducted investigation and hearings on how to restrict access and adopted a different method]; *Schell v. Southern Cal. Edison Co.* (1988) 204 Cal.App.3d 1039 [owner of an RV park filed action alleging his RV park was entitled to residential baseline gas and electricity allocations; proceedings were pending before the commission on whether RV parks should come under a special rate schedule for provision of baseline service].)

In light of the absence of any indication that the PUC has investigated or regulated the issue of stray voltage, and without any evidence that stray voltage cannot be mitigated without violating the PUC's regulation requiring grounding, we cannot say that Wilson's lawsuit would interfere with or hinder any supervisory or regulatory policy of the PUC. Therefore, we hold that Wilson's claims are not within the exclusive authority of the PUC under section 1759.

C. *Sufficiency of the Evidence*

In its appellant's opening brief, Edison argued there was insufficient evidence to support Wilson's claims, focusing on specific elements in each cause of action that Edison asserted Wilson failed to prove. Wilson did not respond directly to Edison's arguments in her respondent's brief, and did not address at all the elements of her claims. Instead she asserted that Edison ignored the evidence of Edison's conduct before Wilson purchased her home, and gave too little weight to the experiences of previous tenants and the evidence of Wilson's emotional distress. We have examined the evidence presented at trial and conclude that Wilson failed to present sufficient relevant evidence to establish the elements of her IIED and negligence claims. We cannot conclude there was insufficient evidence to support Wilson's nuisance claim, since it requires the jury to balance the gravity of the harm from the interference with Wilson's use and enjoyment of her property against the social utility of Edison's conduct. Nevertheless, we hold that judgment with respect to that claim must be reversed and remanded for retrial because the jury considered evidence of Wilson's physical injuries (which should not have been considered because there was no evidence those injuries were caused by her exposure to stray voltage) in balancing the harm against the social utility and finding in favor of Wilson.

1. *IIED*

Edison contends there was no substantial evidence that it engaged in any extreme or outrageous conduct directed at Wilson, and therefore Wilson could not recover on her IIED claim. We agree.

"The elements of the tort of intentional infliction of emotional distress are: '"(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . ." Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' . . . [¶] It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903 (*Christensen*).)

Wilson's theory at trial was that Edison had known for more than 20 years that there was stray voltage at the property Wilson purchased in 2007, that the level of stray voltage was dangerous, as evidenced by the physical injuries Wilson suffered, and that Edison's decision to put the property on the market, its failure to eliminate the stray voltage, and its failure to warn Wilson caused Wilson extreme emotional distress due to her physical injuries and her fear of harm to herself and her children.[26] Had the evidence at trial demonstrated that the level of stray voltage was dangerous and caused Wilson's physical injuries, we might conclude the jury's finding that Edison's conduct was outrageous was supported by the evidence. But there was no such evidence.

---

[26] Wilson's counsel confirmed at oral argument that Wilson's emotional distress was due in large part to her distress over her physical symptoms.

35

To be sure, Wilson presented evidence of various physical ailments she suffered, as well as evidence that she did not begin to suffer those ailments until after she remodeled her master bathroom and began to feel electricity in the shower. Wilson did not, however, present any competent evidence showing that those physical ailments were caused by her exposure to the stray electricity at her house.

Although Wilson testified that a neurologist she went to in May 2011, Dr. Rederich, told her she had severed her nerve endings and that she might be developing secondary erythromelalgia, she also testified that Dr. Rederich could not definitively say what was causing her symptoms. Moreover, the specialist to whom Dr. Rederich sent Wilson, Dr. Beydoun, testified that Wilson did not, in fact, have any nerve damage or secondary erythromelalgia, and that he did not know the cause of her symptoms. Finally, Edison presented the testimony of an expert witness – the former chairman of the department of neurology of Yale Medical School, Dr. Waxman – who testified that he is not aware of any evidence that intermittent contact with low voltage electricity can cause any kind of nerve damage or erythromelalgia. In fact, he testified that electricity (at levels from 10mA to 120mA) is administered to patients in a number of ways within the medical profession, including when administering nerve conduction tests, such as were performed on Wilson.

Without expert testimony linking her physical symptoms to her exposure to stray voltage, Wilson could not rely upon those symptoms as evidence that Edison allowed dangerous levels of stray voltage on her property. (See *Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 ["The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony"]; see also *id.* at p. 403 ["'[I]n the absence of factual circumstances of probability understandable to a jury

36

there must be some scientific testimony that can be interpreted as an inference of hypothetical probability before we can allow a jury to speculate upon the rights of citizens. [¶] . . . If the experts cannot predict probability in these situations, it is difficult to see how courts can expect a jury of laymen to be able to do so"].) In fact, Edison had requested a jury instruction based upon the language in *Jones*, but Wilson objected to the instruction, and the court refused to give it on the grounds that Wilson was asking only for general damages, and not special damages.[27] While we acknowledge that Wilson did not seek to recover special damages for her physical injuries, she clearly relied upon evidence of those injuries in attempting to show both that the level of stray voltage at her house was dangerous and that she suffered emotional distress due to those injuries. Therefore, she was required to establish that those injuries were caused by her exposure to stray voltage, and the trial court erred in refusing Edison's proposed instruction. Because Wilson did not present any evidence to establish the causal connection, we conclude that she failed to present sufficient evidence to support her IIED claim to the extent she relied upon her physical symptoms to show that Edison's conduct was outrageous.

To the extent Wilson contends the evidence she presented regarding stray voltage at her gas meter -- i.e., evidence that the gas company tagged her meter and turned off her gas service for a weekend in August 2008, and tagged her meter again in April 2010 -- establishes that the level of stray voltage on her property was dangerous, that evidence is insufficient to establish outrageous conduct by Edison. First, the fact that the gas company restored service when Edison explained that the

---

[27]    Edison's proposed jury instruction stated: "In a personal injury action, causation must be proven within a reasonable medical probability based upon competent expert testimony. A possible cause only becomes probable when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of the defendant's action."

source of the voltage probably was NEV tends to show that any danger from the voltage on Wilson's gas meter was not significant. Moreover, the evidence showed that Edison worked with the gas company to determine the best way to minimize the stray voltage at the gas meter, and ultimately paid to have the gas company install isolators throughout the neighborhood, which reduced the voltage on Wilson's meter to nearly zero. Thus, a finding of outrageous conduct by Edison cannot be based upon Wilson's allegation that Edison allowed *dangerous* levels of stray voltage onto Wilson's property.

Even if it could be found that a decision to put a property on the market when the levels of stray voltage were enough to perceive but were not dangerous constituted outrageous conduct, the evidence presented at trial was insufficient to hold Edison liable for IIED. Before Edison authorized the release of the property for sale in 1998, it investigated the source of shocks and found a problem on a nearby distribution pole; when that problem was fixed, the stray voltage at the house stopped. Edison's sales and leasing manager went to the house and touched the areas that previously had produced shocks to verify there were no more shocks. After the property was sold in 1999, there were no reports of shocks for the next five years. Thus, the evidence showed that Edison reasonably believed at the time of the sale that it had eliminated the potential for shocks. And when Edison received a report of shocks in 2004, it thoroughly investigated the situation, conducted simulations, and implemented a plan to install a common neutral system. After the system was installed, Edison confirmed with the tenants that they were satisfied with the results, and Edison received no more complaints of shocks or stray voltage until Wilson's gas meter was tagged in 2008.

In short, the evidence presented at trial showed that Edison believed it had eliminated the potential for shocks when it put the house on the market in 1998-1999. When it received a report of shocks five or six years later, it responded by

38

installing a common neutral system, which appeared to fix the problem. When it received reports of electricity at Wilson's gas meter several years later, it responded by working with the gas company to find a solution and paying for the installation of isolators on all of the gas service lines in the neighborhood. Finally, when it received the report that Wilson was experiencing an electrical current in her newly remodeled shower, Edison came to the house, took measurements to determine the level of electricity was not dangerous, explained how the current could be eliminated by installing isolators or bonding the fixture and the drain, and offered to pay for the installation of the isolators. This evidence is insufficient to establish that Edison's conduct was "'so extreme as to exceed all bounds of that usually tolerated in a civilized community.'"[28] (*Christensen*, *supra*, 54 Cal.3d at p. 903.) Therefore, the judgment in favor of Wilson on her IIED claim must be reversed.

2. *Negligence*

To establish liability for Edison's negligence, Wilson was required to present evidence that Edison owed a duty to Wilson, that Edison breached that duty, and that Edison's breach was a proximate cause of the harm Wilson suffered. (*Federico v. Superior Court* (1997) 59 Cal.App.4th 1207, 1210-1211.) Edison contends Wilson failed to establish any breach of duty. We agree.

Wilson attempted to establish a breach of a duty by Edison through the testimony of her expert witness, electrical engineer Douglas Bennett. Bennett

---

[28]     To the extent Wilson relies upon her testimony that an Edison claims representative yelled at her during the May 6, 2011 meeting at her house when she described her symptoms, that evidence is insufficient to establish liability for IIED. (See *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051 ["Liability for intentional infliction of emotional distress '"does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"'"].)

testified that Edison violated standards in the electrical distribution industry in the way it designed its distribution system at the Topaz substation, but he did not know what was wrong with the design. He also stated that Edison violated standards by allowing dangerous levels of electricity to be present at Wilson's home, although he could not state what constitutes a dangerous level. When asked why he believed Edison had not complied with its duties and responsibilities as a distributor of electricity, he said, "[b]ecause the voltage still exists at the property. And that's not right. . . . [¶] [Wilson is] being subjected to these voltages. They are totally out of her control. They can only be addressed by the Edison Company to reduce the voltage present at her house."

Given the undisputed evidence that stray voltage is an unavoidable byproduct of grounding, which is required by the PUC, it cannot be the case that Edison breached a duty owed to Wilson by failing to eliminate all stray voltage at Wilson's house, whether perceived or not. Moreover, because the only injury Wilson claimed in her lawsuit was emotional distress,[29] she was required to show that Edison's breach threatened physical injury to her. (See *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984-985 (*Potter*) ["[T]here is no independent tort of negligent infliction of emotional distress. [Citation.] The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element. [Citations.] That duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship."] "[U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is

---

[29] Wilson's counsel made clear in his closing argument to the jury that the harm for which Wilson sought to hold Edison liable was the emotional distress she suffered as a result of Edison's conduct. He told the jury, "So what I'm asking for is for damages and what's called general damages, anxiety, emotional distress, the inconvenience, the items that are on the verdict form that are – essentially these are the nonfinancial damages. What I'm asking for is for emotional distress for the past and for the future."

an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests." (*Potter*, *supra*, 6 Cal.4th at p. 985.) Thus, at the very least, there could not have been a breach of duty during the period when no shocks were felt on the property.[30]

Even if we assume that exposure to low voltage shocks could threaten physical injury (despite the absence of evidence that the physical injuries Wilson suffered were caused by that exposure, and the testimony of Edison's expert that such exposure does not cause physical injury), there is no evidence that Edison breached any duty of care in this case. As noted, the evidence showed that Edison had eliminated the touch potential in the house in 2005, inasmuch as there were no reports of shocks from that time until Wilson remodeled her bathroom in 2011. That remodel created touch potential in her shower because the water pipes she installed were metal and the drain was connected to the ground. Once she reported the problem to Edison, Edison owed her a duty to eliminate the touch potential. The evidence shows that Edison explained to Wilson (and her boyfriend) what needed to be done to eliminate the touch potential, and offered to pay for the installation of plastic isolators. Wilson, however, refused Edison's offer, insisting that Edison had to eliminate all stray voltage on her property. In light of this

---

[30] Although it might be argued that the stray voltage found at Wilson's gas meter could demonstrate a potential threat of physical injury to the extent it could cause an explosion, the evidence showed that Edison acted to eliminate that threat. It responded to the reports of voltage by explaining to the gas company that the voltage was NEV and agreeing to monitor it (which appeared to address the gas company's concern about any possible danger), and then paid for the installation of isolators on the service lines (which virtually eliminated the voltage).

41

evidence, we conclude that Wilson failed to present sufficient evidence to support her negligence claim because she failed to establish any breach of a duty by Edison that threatened physical injury to her.

### 3. *Nuisance*

Edison contends the judgment on Wilson's nuisance claim must be reversed because the claim is precluded under Civil Code section 3482, which provides that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." According to Edison, because the undisputed evidence establishes that the stray voltage Wilson experienced is an unavoidable byproduct of grounding, and the substation's grounding is both required by and fully compliant with PUC regulations, Civil Code section 3482 applies.

In making this argument, Edison relies upon *Farmers Ins. Exchange v. State of California* (1985) 175 Cal.App.3d 494 (*Farmers*). In that case, plaintiff insurance companies sought damages for automobile paint corrosion caused by the state's pesticide spraying for medfly eradication. Rejecting the plaintiffs' argument that Civil Code section 3482 did not apply because the law at issue "did not 'expressly authorize' the state to damage automobile paint finishes," the appellate court stated: "This misses the point. The authorizing statute need not predict the precise nature of the damages. It need only authorize the governmental action." (*Id.* at p. 503.) Edison argues that in this case, "the PUC need not have 'expressly authorized' stray voltage to exist on properties around a utility's electrical distribution infrastructure, . . . [i]t need only -- as it did -- impose the design, siting, operation, and safety requirements for Edison's electrical distribution system, including grounding, with which Edison complied."

Edison's reliance on *Farmers*, *supra*, 175 Cal.App.3d 494 is misplaced. As the Supreme Court explained in *Varjabedian v. City of Madera* (1977) 20 Cal.3d

285 (*Varjabedian*), "'"'[a] statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury.'" . . . A requirement of 'express' authorization embodied in the statute itself insures that an unequivocal legislative intent to sanction a nuisance will be effectuated, while avoiding the uncertainty that would result were every generally worded statute a source of undetermined immunity from nuisance liability." (*Id.* at p. 291.) Applying this standard in the case before it, which involved a nuisance claim based upon odors emitted from the defendant city's operation of a waste water treatment plant, the Supreme Court rejected the city's argument that "the general authorization of municipal construction of sewage plants 'expressly' sanctions the production of any particular level of odors within the meaning of [Civil Code] section 3482." (*Varjabedian*, *supra*, 20 Cal.3d at p. 292.) The Court observed: "None of the Government Code statutes under which the city claims to act mentions the possibility of noxious emanations from such facilities. Nor can we find that such odors were authorized by the 'plainest and most necessary implication' from the general powers there conferred, or that it can be fairly said that the Legislature contemplated, to any extent, the creation of a malodorous nuisance when it authorized sewage plant construction. Indeed, one object of such plants is to *remove* harmful and obnoxious effluents from the environment." (*Ibid.*)

The appellate court in *Farmers* distinguished the Supreme Court's decision in *Varjabedian* on the grounds that the nuisance complained of in *Farmers*, "the release of a chemically destructive spray into the atmosphere, was precisely what

was authorized by the various statutes [at issue]." (*Farmers*, *supra*, 175 Cal.App.3d at p. 503.) The same cannot be said in this case. Rather, the nuisance complained of here is similar to the nuisance complained of in *Varjabedian*, i.e., a byproduct of a facility constructed in accordance with statutes or regulations authorizing such facilities. Therefore, we find that Civil Code section 3482 does not preclude Wilson's nuisance claim.

Although we reject Edison's argument that Civil Code section 3482 precludes Wilson's nuisance claim, we cannot affirm the judgment on that claim.[31]

As we have explained, Wilson presented substantial evidence of various physical injuries she suffered, but failed to show that any of those injuries were caused by her exposure to stray voltage. In fact, the undisputed expert evidence established that exposure to that level of electricity would not cause injury. While we do not doubt that Wilson suffered from the symptoms she described, they were irrelevant to her claims in the absence of any showing of a causal connection between the symptoms and her exposure to stray voltage.[32] It appears, however, that the jury considered Wilson's injuries in reaching its verdict on at least one of

---

[31]    After oral argument, we asked the parties for briefing on whether the nuisance claim should be reversed and remanded on the grounds that (1) it cannot be determined whether the jury considered irrelevant evidence when determining whether the seriousness of the harm to Wilson outweighed the public benefit of Edison's conduct; and (2) the jury was not instructed on the factors it was to consider to determine whether the seriousness of the harm to Wilson outweighed the public benefit of Edison's conduct. We have received and considered the supplemental briefing from both parties.

[32]    We emphasize that Wilson's theory at trial was that she suffered emotional distress as a result of physical symptoms purportedly caused by stray voltage, not that the stray voltage caused her emotional distress, which then caused the physical symptoms. In any event, she did not present any competent evidence that the symptoms she described could have resulted from emotional distress.

44

her claims, because it asked the court for a read back of Wilson's testimony "regarding her symptoms and the dates of symptoms, doctor's visits, et cetera."

There is no doubt that the jury considered this irrelevant evidence in deciding the nuisance claim. The jury was instructed to determine whether Wilson was harmed by Edison's conduct and whether the seriousness of the harm outweighed the public benefit of Edison's conduct.[33] We acknowledge that to recover on a nuisance claim the harm the plaintiff suffers need not be a physical injury. (See, e.g., *Acadia, California, Ltd. v. Herbert* (1960) 54 Cal.2d 328, 337 ["regardless of whether the occupant of land has sustained physical injury, he may recover damages for the discomfort and annoyance of himself and the members of his family and for mental suffering occasioned by fear for the safety of himself and his family when such discomfort or suffering has been proximately caused by a trespass or a nuisance"]; *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 919 ["The statutory definition of nuisance appears to be broad enough to encompass almost any conceivable type of interference with the enjoyment or use of land or property"]; Civ. Code, § 3479 ["Anything which is injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so

---

[33] The jury was given CACI No. 2021, which instructed that, to establish her nuisance claim, "Wilson must prove all of the following: [¶] No. 1, that Southern California Edison Company by acting, or failure to act, created a condition or permitted a condition to exist that was harmful to [health, indecent] or offensive to the senses, or was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. [¶] No. 2, that this condition interfered with Simona Wilson's use or enjoyment of her property. [¶] No. 3, that Simona Wilson did not consent to Southern California Edison Company's conduct. [¶] No. 4, that an ordinary person would be reasonably annoyed or disturbed by Southern California Edison Company's conduct. [¶] No. 5, that Simona Wilson was harmed. [¶] No. 6, that Southern California Edison Company's conduct was a substantial factor in causing Simona Wilson harm; and [¶] No. 7, that the seriousness of the harm outweighed the public benefit of Southern California Edison Company's conduct."

as to interfere with the comfortable enjoyment of life or property . . . is a nuisance"].)  Thus, the absence of evidence in this case to establish that Wilson's physical injuries were caused by the stray voltage would not preclude recovery on her nuisance claim.

Nevertheless, the jury's verdict on the claim cannot stand because under Wilson's theory of the case, those physical injuries were an integral part of the harm she purportedly suffered.  For example, when explaining to the jury that it needed to determine how to compensate Wilson for her damages in the lawsuit, counsel for Wilson told the jury:  "[Y]ou have to identify what are the harms and losses that were caused by Edison. . . .  Ms. Wilson discovered on April 20th that there was electricity on her line.  That date started an absolute nightmare for her and her family.  She went to her doctor, to a neurologist, and was told that she had nerve damage which set off a chain of months and months and even years of tests, every blood test know[n] to mankind, skin biopsies, nerve conduction studies, over and over and over again.  Specialist.  Taking her kids to the doctor to make sure they are okay.  [¶]  She had to eventually leave the house.  She was told by her inspector who was the only person not attached to Edison, get out of the house immediately.  She couldn't afford to keep paying the mortgage on this house and to live in another place.  Her credit was destroyed.  She has been -- she's gone through all this emotional distress with her kids in that house.  They see it.  She's worried about them.  Are they feeding off me.  It is absolutely a disaster."  When counsel later specifically addressed damages for her nuisance claim, counsel referred back to his earlier discussion of Wilson's "nightmare," stating:  "What is the amount to compensate Ms. Wilson for interference with her use and enjoyment of her property.  Ms. Wilson has -- basically from April 19 through today or through when she moved out [of her] house, that home was essentially rendered useless. . . .  [¶]  Having electricity all over your fixtures, it effectively destroyed

46

her use and enjoyment of the home. I mean, what else can I say. It's a nightmare and we've gone through that. So I'm going to ask for $500,000 for the nuisance claim." Counsel then discussed Wilson's physical symptoms, and argued that all of the doctors who testified acknowledged that her symptoms were real. Because the evidence of Wilson's physical injuries should not have been considered by the jury when evaluating the gravity of the harm Wilson suffered from Edison's interference with her property, we must reverse the judgment and remand the matter to the trial court for a retrial on the nuisance claim.

### a. Jury Instructions on Retrial

Because the nuisance claim must be retried, we must address an issue regarding the jury instruction for that claim. As noted, the jury was instructed that to find in favor of Wilson, it had to find that "the seriousness of the harm [suffered by Wilson] outweighed the public benefit of Southern California Edison Company's conduct." No instructions were given as to what factors the jury should consider in making this determination. We conclude that additional instructions are required because without any guidance on the factors to consider, the jury cannot properly assess the seriousness of the harm or the public benefit.

In *Covalt*, the Supreme Court discussed the unique nature of a private nuisance cause of action. The Court compared nuisance to trespass, and noted that unlike trespass, a nuisance claim requires proof "that the invasion of the plaintiff's interest in the use and enjoyment of the land was *substantial*, i.e., that it caused the plaintiff to suffer 'substantial actual damage'" and that "'[t]he interference with the protected interest [was] *unreasonable'* [citation], i.e., it must be 'of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land.'" (*Covalt*, *supra*, 13 Cal.4th at p. 938.) The Court observed that "[t]his requirement flows from the law's recognition that 'Life in

47

organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms. It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together. The very existence of organized society depends upon the principle of "give and take, live and let live," and therefore the law of torts does not attempt to impose liability or shift the loss in every case in which one person's conduct has some detrimental effect on another. Liability for damages is imposed in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation.' (Rest.2d Torts, § 822, com. g., p. 112.)" (*Covalt*, *supra*, 13 Cal.4th at pp. 937-938.)

The Court explained that "[t]he primary test for determining whether the invasion is unreasonable is whether the gravity of the harm outweighs the social utility of the defendant's conduct, *taking a number of factors into account*." (*Covalt*, *supra*, 13 Cal.4th at p. 938, italics added.) The Court did not discuss those factors – because it found in that case that the nuisance claim was under the exclusive jurisdiction of the PUC – but instead cited to the Restatement Second of Torts, sections 826 through 831.

Section 826 of the Restatement provides that an invasion is unreasonable if "(a) the gravity of the harm outweighs the utility of the actor's conduct, or [¶] (b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible." (Rest.2d Torts, § 826.)

Section 827 of the Restatement lists the factors to be considered in determining the gravity of the harm from an intentional invasion of another's interest in the use and enjoyment of land: "(a) The extent of the harm involved; [¶] (b) the character of the harm involved; [¶] (c) the social value that the law attaches to the type of use or enjoyment invaded; [¶] (d) the suitability of the particular use or enjoyment invaded to the character of the locality; and [¶] (e) the burden on the person harmed of avoiding the harm." (Rest.2d Torts, § 827.)

The factors to be considered in determining the social utility of conduct that causes an intentional invasion of another's interest in the use and enjoyment of property are found in section 828 of the Restatement: "(a) the social value that the law attaches to the primary purpose of the conduct; [¶] (b) the suitability of the conduct to the character of the locality; and [¶] (c) the impracticability of preventing or avoiding the invasion." (Rest.2d Torts, § 828.)

Restatement sections 829 through 831 provide alternate tests to determine when an intentional invasion is unreasonable: when the harm caused by the invasion is "significant" and the actor's conduct is "for the sole purpose of causing harm to the other" or "contrary to common standards of decency" (Rest.2d Torts, § 829); when "the harm resulting from the invasion is severe and greater than the other should be required to bear without compensation" (Rest.2d Torts, § 829A); when "the harm is significant and it would be practicable for the actor to avoid the harm in whole or in part without undue hardship" (Rest.2d Torts, § 830); or when the harm is "significant" and "the particular use or enjoyment interfered with is well suited to the character of the locality" and "the actor's conduct is unsuited to the character of that locality" (Rest.2d Torts, § 831).

The CACI instruction given to the jury in this case (CACI No. 2021) did not address any of these factors or alternate tests. The absence of any instruction on these factors or tests not only left the jury without any guidance as to the proper

49

focus of their deliberations,[34] it also rendered CACI No. 2021 an incorrect statement of the law because it allowed the jury to find liability for nuisance even if the jury did not find that the harm to Wilson was substantial. The instruction merely stated, as the fifth element that Wilson must prove, "that Simona Wilson was harmed." (See CACI No. 2021, element 6 ["6. That [*name of plaintiff*] was harmed"].) Moreover, the fourth element set forth in the instruction seemed to suggest that the harm need not be substantial, because it stated that Edison's conduct needed only be enough to "reasonably" annoy or disturb an ordinary person. (CACI No. 2021, element 5 ["5. That an ordinary person would be reasonably annoyed or disturbed by [*name of defendant*]'s conduct"].)

Had the jury been instructed on the proper factors to consider when weighing the gravity of the harm against the social utility of Edison's conduct and found Edison liable, the statement of these elements would be sufficient because in finding in favor of Wilson the jury necessarily would have concluded that the harm was substantial. Without such instruction, it is not. Therefore, on retrial the jury must be given an additional instruction to supplement CACI No. 2021. The

---

[34] In fact, Wilson's attorney may have misled the jury about what it should consider when determining whether the seriousness of the harm outweighed the public benefit of Edison's conduct. Addressing this element during closing argument, counsel stated: "[T]he final element here is that the seriousness of the harm outweighs the public benefit. That, I think, is an easy one because no one is claiming there's a public benefit to putting unacceptable levels of voltage on fixtures." Counsel misidentified the "public benefit" to be considered. The question is not whether the interference itself is a "public benefit." Rather, the question is whether the conduct that causes the interference is a "public benefit." (See Rest.2d Torts, § 828, subd. (a) [to determine the social utility of conduct that causes the invasion, one must consider "the social value that the law attaches to the *primary purpose of the conduct*"], italics added.)

50

additional instruction, which for clarity should immediately follow CACI No. 2021, is as follows:[35]

In determining whether the seriousness of the harm Wilson suffered outweighed the public benefit of Edison's conduct you should consider the following factors.

To determine the seriousness of the harm Wilson suffered, you should weigh:

a. The extent of the harm, meaning how much the condition Edison caused (that is, stray voltage) interfered with Wilson's use or enjoyment of her property, and how long that interference lasted.

b. The character of the harm, that is, whether the harm involved a loss from the destruction or impairment of physical things she was using, or personal discomfort or annoyance.

c. The value society places on the type of use or enjoyment invaded; in this case the property was used as a residence. The greater the social value of the particular type of use or enjoyment of land that is invaded, the greater the gravity of harm from the invasion.

d. The suitability of the type of use or enjoyment invaded to the character of the locality. The character of a locality is based upon the primary kind of activity at that location, such as residential, industrial, or other activity.

e. The extent of the burden (such as expense and inconvenience) on Wilson to avoid the harm.

---

[35] By providing this instruction, we simply seek to give guidance to the trial court in this case. We suggest that the CACI committee consider our concerns regarding CACI No. 2021 and determine if additional instructions should be drafted for use generally in nuisance cases.

51

To determine the social utility of Edison's conduct, you should weigh:

a. The value society places on the primary purpose of the conduct that caused the interference. The primary purpose of the conduct means Edison's main objective for engaging in the conduct. How much social value a particular purpose has depends upon how much its achievement generally advances or protects the public good.

b. The suitability of the conduct that caused the interference to the character of the locality. The suitability of the conduct depends upon its compatibility to the primary activities carried on in the locality.

c. The practicability or impracticality of preventing or avoiding the invasion.

D. *Punitive Damages*

Edison contends the punitive damages award must be reversed because there is no substantial evidence that an Edison managing agent authorized or ratified any alleged malicious, oppressive, or fraudulent conduct. We agree.

"In a civil case not arising from the breach of a contractual obligation, the jury may award punitive damages 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.' (Civ. Code, § 3294, subd. (a).) 'Malice' is defined as intentional injury or 'despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.' (*Id.*, § 3294, subd. (c)(1).) 'Oppression' is defined as 'despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.' (*Id.*, § 3294, subd. (c)(2).)" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712.) The term "despicable" is not defined in the statute, but the Supreme Court has observed that it is applicable to

"circumstances that are 'base,' 'vile,' or 'contemptible.'" (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725.)

When the defendant is a corporation, "[a]n award of punitive damages against a corporation . . . must rest on the malice of the corporation's employees. [¶] But the law does not impute every employee's malice to the corporation." (*Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 167.) Instead, the oppression, fraud, or malice must be perpetrated, authorized, or knowingly ratified by an officer, director, or managing agent of the corporation. (Civ. Code, § 3294, subd. (b).) "'[M]anaging agent' . . . include[s] only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566-567.)

In this case, Edison notes that Wilson's assertion that an officer or managing agent of Edison authorized or knowingly ratified alleged despicable conduct is based upon the testimony of two witnesses: William Perry, an employee of the gas company, who testified that discussions between Edison and the gas company regarding mitigation of stray voltage on neighborhood gas meters included vice presidents of Edison; and Tina Drebushenko, an Edison employee who sent emails regarding reports of shocks at the property in 1997 to several Edison employees, including at least one manager who "should have some impact with [Edison] policy." Wilson does not dispute that this was the only evidence showing knowledge on the part of Edison officers or managing agents.

But as Edison observes, even if this testimony establishes that managing agents ratified or authorized something, the conduct they ratified was far from despicable. While these managing agents no doubt were aware that stray voltage was present on Wilson's property (although Wilson did not own the property at the time of Drebushenko's email), they were made aware of that in the context of

53

Edison attempting to mitigate it to ensure the level of voltage did not present any danger to the occupants of the property. This certainly does not constitute oppression, fraud, or malice. Therefore, the punitive damages award must be reversed. Because Wilson failed to present sufficient evidence to support an award of punitive damages, she is not entitled to seek punitive damages on retrial of her nuisance claim.

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to enter judgment in favor of Edison on Wilson's IIED and negligence claims, and hold a retrial of her nuisance claim. On retrial, the trial court must instruct the jury on the factors it should consider in determining whether the gravity of the harm Wilson suffered outweighed the public benefit of Edison's conduct that caused the interference. Wilson is not entitled to seek punitive damages on retrial. The parties shall bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, J.


We concur:


EPSTEIN, P. J.                    COLLINS, J.


54