Filed 3/26/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| SIMONA WILSON, | B275845 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. YC065545) |
| v. | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court for Los Angeles County, Ross M. Klein, Judge. Judgment reversed and matter remanded; cross-appeal dismissed as moot.

Grassini, Wrinkle & Johnson, Roland Wrinkle and Lars Johnson for Plaintiff and Appellant.

Southern California Edison, Carla M. Blanc, Leon Bass, Jr.; Limnexus, Arnold Barba, Sandra Sakamoto; Munger, Tolles & Olson, Stephen M. Kristovich; Greines, Martin, Stein & Richland, Jonathan H. Eisenman and Robin Meadow for Defendant and Appellant.

This case is before us for the second time. It involves a homeowner–plaintiff Simona Wilson–who bought a house next door to an electrical substation (the Topaz substation) operated by defendant Southern California Edison Company (Edison). After remodeling her master bathroom four years after she moved into the house, Wilson felt low levels of electricity in her remodeled shower when she adjusted the showerhead. This flow of electricity was due to neutral-to-earth voltage (NEV), also referred to as stray voltage, on her property. Because NEV is unavoidable in a grounded electrical system, such as the one operated by Edison, Edison was unable to completely eliminate it from Wilson's property as Wilson insisted, although it recommended ways to reduce the voltage in her shower to below-perceptible levels. Fearing for her safety and the safety of her three children, Wilson moved out of the house into a rental property. Because she could not afford to pay both the rent on that property and the mortgage on her house, the house went into foreclosure, ruining her credit.

Wilson sued Edison for negligence, intentional infliction of emotional distress (IIED), and nuisance, and sought punitive damages. In the first trial, the jury found in favor of Wilson on all three claims, awarding $550,000 on the negligence and IIED claims, $500,000 on the nuisance claim, and $3 million in punitive damages. Edison appealed. In a published decision (*Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123 (*Wilson I*), we found there was insufficient evidence to support the negligence and IIED claims or the punitive damages award, and found that the jury relied upon irrelevant evidence when determining the nuisance claim. (*Id.* at p. 130.) We reversed the

judgment, ordered judgment entered in favor of Edison on the negligence and IIED claims, and remanded to the trial court for a retrial on the nuisance claim. (*Ibid.*)

On retrial the trial court, over Edison's objections, allowed Wilson to present extensive evidence of incidents related to stray voltage at the house that occurred before Wilson bought it and at other nearby properties, and Edison's conduct with regard to those incidents. The jury again found in favor of Wilson, and awarded her $1.2 million in damages on her nuisance claim. Wilson moved for her attorney fees under Code of Civil Procedure[1] 1021.5, on the ground that her action resulted in a published decision (*Wilson I*) that addressed an important right affecting the public interest, i.e., whether the California Public Utilities Commission (the PUC) had exclusive jurisdiction over claims regarding stray voltage. The trial court denied the motion, finding that Wilson's financial stake in the litigation was a sufficient incentive to pursue the litigation.

Edison appeals from the judgment in favor of Wilson, and Wilson cross-appeals from the denial of her attorney fee motion.

Edison contends in its appeal that: (1) it is entitled to judgment because, as a matter of law, the harm Wilson suffered cannot outweigh the public benefit of providing electricity; (2) it is entitled to a new trial because the trial court improperly allowed Wilson to present inflammatory irrelevant evidence related to stray voltage incidents

---

[1]	Further undesignated statutory references are to the Code of Civil Procedure.

3

involving prior owners or tenants of the property or other nearby properties; (3) it is entitled to a new trial on damages (if not a retrial on both liability and damages) because the jury improperly included in its award damages to which Wilson was not entitled, such as attorney fees; and (4) it is entitled to a new trial on damages (if not a retrial on both liability and damages) because the $1.2 million award is excessive.

In her cross-appeal, Wilson contends the trial court erred in denying her request for attorney fees under section 1021.5 because the legal right that was enforced in *Wilson I* was important and protects the public interest, the published opinion conferred a significant benefit on the general public, and the cost to pursue a case against a large entity such as Edison transcended her personal interest.

We find that based upon the evidence presented at trial, we cannot conclude *as a matter of law* that the harm Wilson suffered does not outweigh the public benefit of Edison's conduct. However, we find that the trial court erred in admitting irrelevant evidence related to stray voltage incidents involving prior owners or tenants of the house or other properties, and that the admission of that evidence was prejudicial to Edison. Accordingly, we reverse the judgment and remand to the trial court for retrial of the nuisance claim. In light of our reversal of the judgment, we dismiss as moot Wilson's cross-appeal.

## BACKGROUND

A.  *Fundamentals of Electrical Distribution Systems and Electricity*

As was the case in *Wilson I*, "[a]nalysis of the facts and issues in this case requires a basic understanding of electricity and electrical

4

distribution systems." (*Wilson I, supra,* 234 Cal.App.4th at p. 130.) We therefore include here our discussion of the fundamentals of electrical distribution systems and electricity from our earlier opinion:

"Electricity is produced at a generating plant. Because it is not economical to send electricity over long distances at low voltages, the electricity produced at the plant is stepped up through transformers to a very high voltage before it is sent out over transmission lines. A substation, such as Edison's Topaz substation at issue in this case, receives the high voltage electricity from the generating plant and steps it down through transformers to 4,000 volts. It then sends the electricity over distribution lines out to the neighborhood power poles, where an additional transformer steps down the voltage to 240/120 volts before delivering the electricity to homes or businesses.

"In order for electricity to flow, there must be a complete circuit. In other words, when electricity is sent out from a transformer to a 'load' (i.e., something that is using electricity, such as a light or appliance), it must have a return path. Typically, electricity is sent over one conductor (wire), called the 'hot,' and returns on another conductor called the "neutral." The flow of electricity is referred to as 'current' and is measured in amperes (or amps); voltage is the pressure that drives the current. The amount of current depends in part upon the amount of resistance in the circuit; e.g., a 100–watt lightbulb has

5

less resistance than a 60–watt lightbulb, so there will be a larger current flowing through it (and therefore the bulb burns brighter).[2]

"For safety reasons, electrical systems usually are grounded. That means that at various points in the system, including at the substation, a connection is made from the neutral to the ground, i.e., the earth. Because the earth is conductive, it can provide a return path for the flow of electricity. Therefore, if, for example, an energized wire fell to the ground from the distribution lines, the earth would provide a path for the current to return to the substation, where a protective device would break the circuit. But the conductivity of the earth also can present a danger to someone who touches a source of electricity. If that person is in physical contact with the earth, electricity will flow from the electrical source, through his or her body, to the earth and on to the distribution system or substation, thus completing the circuit. The amount of current will depend on the resistance of the person's body, the amount of contact area, and the amount of voltage present.

"In a grounded electrical system, there will always be some current flowing back to the substation through the earth. This is referred to as neutral-to-earth voltage, or 'NEV,' and it cannot be entirely eliminated. NEV is one cause of 'stray voltage,' which is voltage of 10 volts or less appearing on objects that are not part of an electrical system, that can be simultaneously contacted by members of

---

[2] "The amount of current also depends on the amount of voltage. The amount of current is calculated using Ohm's Law: current (in amps) equals voltage (volts) divided by resistance (ohms)." (*Wilson I, supra*, 234 Cal.App.4th at p. 131, fn. 1.)

the general public.[3]  Metal objects, such as water pipes or gas lines, that are buried in or connected to the earth will conduct electricity, so if a person in a home touched a water pipe that was energized due to NEV while also touching the earth or another conductor at a different voltage, a circuit would be completed and current would run through that person's body.  This 'touch potential' can be eliminated by replacing metal pipes with plastic pipes or installing isolators (such as a short section of plastic pipe) to stop the flow of electricity onto metal fixtures, or by connecting (or 'bonding') the two conductors to equalize the voltage between the two.

"The physiological effects of current flowing through a person's body depends upon the amount of the current.  According to a leading reference, a woman who encounters a current of 0.3 milliamps (mA) would not feel anything.  At 0.7mA, she would feel a slight tingling; that typically is the perception threshold.  At 1.2mA, she would feel a shock, but it would not be painful and muscular control would not be lost.  She would feel a painful shock at 6mA, but she would still have muscular control.  The let-go threshold is at 10.5mA, and at 15mA, she would feel a severe shock, have muscular contractions, and her breathing could be difficult.[4]" (*Wilson I, supra*, 234 Cal.App.4th at pp. 130-132.)

---

[3]     "Stray voltage also can be caused by wiring faults (i.e., a short circuit in which an energized conductor makes contact with a grounded surface) or corrosion of a neutral conductor." (*Wilson I, supra*, 234 Cal.App.4th at p. 131, fn. 2.)

[4]     "These current figures are for 60-Hz, alternating current, like the electricity supplied to homes.  Another leading reference chart, which takes into account the amount of time of the contact, shows that perception is

B.     *Events Leading Up to Lawsuit*

Wilson and her then-husband Ryan bought the house at issue–located at 904 Knob Hill Drive in Redondo Beach–in March 2007, when she was pregnant with her second child.[5]  The house is adjacent to Edison's Topaz electrical substation.  Before buying the house, Wilson asked the prior owner and his broker about the substation; based on that conversation, she was satisfied that there were no safety hazards associated with the substation affecting the house.

Wilson first became aware there was a voltage issue affecting her property on Friday, August 22, 2008, when Ryan came home and found a tag on their door saying that the gas had been shut off due to electricity at the gas meter, and instructing them to contact Edison.  Because they did not get the notice until Friday night, they had to wait until Monday to contact Edison, so they had no gas for the weekend.  On Monday, Ryan contacted Edison, and Edison sent someone to the house.  That person attached a wire to the gas meter and ran the wire to the substation.  Wilson was told that the purpose of the wire was to allow Edison to monitor the voltage on the gas meter in order to satisfy the gas company that it was safe to turn the gas back on.

---

possible up to 0.5mA, and that current above 10mA likely would produce involuntary muscle contractions, but there usually would not be any harmful physiological effects." (*Wilson I*, *supra*, 234 Cal.App.4th at p. 132, fn. 3.)

[5]     Ryan moved out of the house in late December 2008; he and Wilson ultimately divorced.

In April 2010, Wilson got another notice from the gas company that there was electricity at the gas meter. This time, however, the gas company did not turn off the gas. Wilson did not contact Edison or the gas company, since Edison was still monitoring the gas line and the gas had not been turned off. Her reaction to the notice "[r]anged from annoyance to fear, irritation, frustration."

In February 2011, Wilson remodeled her master bathroom. Her father, a tile and stone contractor, did the work. He removed the bathtub, which was sitting on a wooden pedestal, and changed the drain to convert it to a tiled stall shower on a concrete slab. The drain was connected to a cast iron pipe that ran through the ground. He also added an outdoor shower. The remodel took several weeks, and was completed in March 2011.

After the remodel was completed, Wilson noticed that every time she adjusted the showerhead in the master bathroom shower she would "get this tingling in [her] arm." She is a swimmer, and thought she might have a pinched nerve. On April 19, 2011, she was taking a shower and told her boyfriend, Jason Stelle, that she thought she had a pinched nerve, so he said he would adjust the showerhead for her.[6] When he did so, he "felt basically a tingling sensation starting in [his] fingers and starting to emanate down [his] arm."

Wilson called her father and told him about what they felt. Her father was concerned that one of his staples had nicked a wire during

---

[6]     Stelle was engaged to Wilson; he lived at the house with Wilson from September 2009 until September 2011.

the construction, and wanted his electrician to do some testing. Wilson's father brought his electrician to the house the next day. The electrician did some testing, and confirmed there was voltage in the shower; he also found voltage at the gas meter, water meter, two hose bibs, and the waste and overflow pipes for the bathtub. He found that even after he turned off all power to the house there was voltage in those locations. He recommended that they call Edison.

Stelle, who worked from home and therefore was able to meet with service people at the house, called Edison that day (April 20) or the next day.[7] No one from Edison came to the house either day. On April 22, which was a Friday, Wilson called Edison and demanded that someone tell her what was going on. That day, Edison technicians came to the house on two separate occasions and took readings. Stelle spoke with the technicians, but they did not provide any explanation for what was happening, nor did they provide a solution to the problem.

Wilson called Edison several times the following week, until April 27, when Matt Norwalk, a technical specialist in Edison's Power Quality Department went to the house and spoke to Stelle. Norwalk took voltage measurements in the master bathroom shower and gas meter, both with a resistor and without one.[8] He found 2.4 volts

---

[7] Wilson testified that Stelle "called Edison immediately." Stelle, however, testified that he called the day after Wilson's father and the electrician came to the house.

[8] A resistor is used to simulate the internal body resistance of a person, to determine how much, if any, electricity would flow through a person who came in contact with the item while in contact with the ground.

without the resistor in the shower (from the showerhead pipe to the drain) and 2.2 volts with it, and 1.5 volts without the resistor at the gas meter and 0.5 volts with it. He explained to Stelle that the voltage was stray voltage from the normal delivery of electrical power. He noted there was a history of stray voltage on Wilson's property, although he did not provide any specifics regarding the types of incidents that had occurred. He did, however, tell Stelle that Edison had done a simulation study for a previous owner of the property that explained the stray voltage phenomenon. According to Stelle, Norwalk told him that the stray voltage was within Edison's standards, and there were no plans to change it. Stelle asked Norwalk to come back to the house when Wilson could be there so he could explain it all to her. A meeting was arranged for May 6.

On May 6, 2011, Norwalk, along with two other Edison employees, met with Wilson, Wilson's father, their electrician, and Stelle (although Stelle was caring for the children for most of the meeting). The meeting lasted for about two hours. The group walked around the house, starting with the master bathroom, and then going to the gas line, since those were the two main concerns. Norwalk took measurements at the shower, and got the same readings he had gotten on April 27, i.e., 2.4 volts without the resistor and 2.2 volts with the resistor. They then went to the gas meter, where Norwalk measured 1.4 volts without the resistor and 0.5 volts with the resistor.[9]

---

[9] Norwalk testified that it typically takes around one volt in order to push enough current through a human body that electrical current can be perceived.

11

In addition to taking the measurements, Norwalk showed Wilson a graph of the readings on her gas line, which Edison had been monitoring since 2008. Wilson noted that there was a "huge chunk of data missing." Norwalk explained that the memory card on the machine that was monitoring the voltage had run out, and Edison did not catch it from December 2010 until April 2011. But he showed Wilson that the measurements that were taken right before the memory card ran out and right after it was replaced were nearly identical.

The parties dispute what happened next.

According to Wilson, Norwalk told her that the conditions at her house were within Edison's safety standards. Norwalk recommended that she shower at off-peak hours, when people were not using as much electricity, so the load on the substation was not as great. She testified that neither Norwalk nor either of the other Edison representatives offered any way to fix the stray voltage problem, although she admitted they gave recommendations about ways to make the master bathroom shower less conductive, including possibly bonding the showerhead to the drain in the shower to make it so there is no shock potential. Wilson did not find those recommendations helpful because she believed they were temporary measures; she wanted a permanent solution that would completely eliminate the stray voltage on her property.

According to Norwalk, Wilson asked how Edison was going to get rid of the voltage at the gas meter and master bathroom shower, and he explained that, because it was stray voltage from the normal operation

12

and delivery of electrical power from the substation, the only way to resolve it would be to either put isolators within the plumbing system or to bond the sewer line to the water line.  Wilson's father asked him how that would be done, and Norwalk explained that it might require removing the tile floor of the shower (for bonding) or cutting holes in the wall (for isolators).  Norwalk told Wilson that she could use the contractor of her choice to do the work and submit the bill to Edison for reimbursement.[10]  Wilson said that she did not want any more construction in her house because her children had already been exposed to construction dust and she did not want them exposed to more; she wanted Edison to fix the problem on its side, without doing any work on her house.

A few days after the May 6 meeting, Wilson had a telephone conversation with Rick McCollum, an investigations manager for Edison.  What was said during that conversation also is in dispute.

According to McCollum, he told Wilson that Norwalk and other technicians had offered some solutions to the stray voltage at her house, and that Edison would be happy to pay to implement those solutions, either by having Wilson use her own plumber and be reimbursed by Edison or by having Edison hire a plumber to do the work.  Wilson, however, said that she did not want people traipsing through her house.

---

[10]     Both Stelle and Wilson's father testified that they did not hear anyone from Edison offer to pay for any kind of remedy to deal with the voltage on the shower or gas line.

At one point, he asked her what she wanted from Edison, and she said she wanted Edison to buy her house.

According to Wilson, McCollum only suggested bonding as a way to minimize the stray voltage in the shower, and did not say that Edison would pay for it. She did not tell McCollum that she wanted Edison to buy her house.

Wilson continued to live in the house with Stelle and her children.[11] As a precaution to protect herself and her children from electricity, she covered everything that was metal (like faucets) with duct tape and put rubber mats down almost everywhere. She stopped using the master bathroom shower. She and the older children showered outside, and she showered more at the gym.[12] In June or July 2011, she felt a shock while using the outside shower, and stopped using it after that.

C.   *Filing of the Lawsuit and Subsequent Events*

In September 2011, the same day she filed the present lawsuit, Wilson moved out of the house. She moved to a rental property about three miles away. In October, shortly after she moved out, she received a letter from Edison, offering to fix the stray voltage issue by putting in plastic plumbing pipes. She rejected the offer because she had signed a

_____

[11]   In 2011, Wilson had three children–two with her husband and one with Stelle–who ranged in age from one to six years old.

[12]   We note there is a second bathroom in the home, with a bathtub/shower. Neither Wilson nor any of her children ever felt electricity while using the bathtub/shower.

one-year lease on the rental property, and because she "felt it was a band-aid and not a solution"; she wanted the stray voltage completely eliminated, rather than simply reduced to below perception levels.

At the time Wilson moved out of the house, she was current with the mortgage payments, but as a result of having to pay to live at the rental property, her house went into foreclosure. The foreclosure dropped her credit rating by over 350 points, and all of her credit cards dropped her down to bare-minimum levels.

In February 2013, Edison found out that Wilson's house had been sold. Norwalk met with the new owners' broker and told him about the tingling sensation felt by the previous owner. He asked to take voltage measurements throughout the property, both inside and outside. He found perceptible levels of voltage in only two places: the master bedroom shower and the outside shower.[13] He told the broker that Edison could bring in a plumber to install sections of polyethylene piping in the copper water lines or to use a dielectric union (another kind of isolator) to eliminate the voltage at those places. The broker agreed.

Norwalk discussed the options with the plumber, and they decided to try the dielectric unions first, to see if that would eliminate the voltage on the master bathroom shower and the gas line. After they were installed, Norwalk measured the voltage in the shower and at the gas line. At the gas line he measured zero volts with and without a

---

[13] Although the gas meter had some voltage, it was below a perceptible level.

resistor, but voltage remained at the shower. Edison brought the plumber back for another day to install sections of polyethylene piping in both the master bathroom shower and the outside shower. After that work was done, Norwalk measured zero volts with the resistor at all locations. Installation of all the isolators took two or three days, and cost just over $5,000.

In addition to installing the isolators, Edison tested other methods that might reduce the stray voltage at the property. In February 2013, Edison installed a dedicated transformer for the house, to see if isolating a transformer to that location would lower the stray voltage. It found that although the dedicated transformer lowered the stray voltage, it did not eliminate it entirely, and the fluctuation of load on the substation would bring the voltage up to a perceptible level.[14]

In May 2013, Norwalk was contacted by the broker for the property, who told him there was a prospective buyer, John Seamons, who wanted to meet with him to get an explanation regarding the stray voltage. Norwalk met with Seamons at the house. Norwalk told him about the voltage measurements, the history of the house (including

---

[14] The voltage level at the property already had been reduced when, in October 2012, Edison performed additional grounding at the substation. This work was done after a car accident caused a high voltage line to fall into one of the supply lines coming from the substation, which elevated the voltage on the grounding grid. Due to concerns about the safety of Edison personnel at the substation, a study of the grounding grid was conducted, and ground wells were installed to enhance the ground grid. After the work was completed, Norwalk discovered that the stray voltage on Wilson's property was reduced by approximately 40 percent, although it did not reduce the voltage to below perception levels.

that the prior owner had felt a tingling sensation in the shower), and explained the work Edison had done to install isolators. He also told Seamons that if he decided to change any of the plumbing in the house, he (Norwalk) would make himself available to discuss the best way and best work methods to continue the isolation at those locations.

Seamons lived in the house with his wife and children from July 2013 to May 2015. During that time, neither he nor any member of his family experienced stray voltage anywhere on the property. They moved out of the house for work reasons.

When Seamons was selling the house, he contacted Norwalk and asked him to come to the house to recheck the voltage measurements. Norwalk did so, and detected some voltage–slightly above one volt–on a spigot on the outside of the house. Edison brought in a plumber to install a section of polyethylene piping into the supply to the spigot, which reduced the voltage to zero. Norwalk also found zero volts at the master bathroom shower, the outside shower, and the gas meter. He provided those readings in writing to Seamons so he could provide them to the new owner. Since that time, Edison has not received any complaints of stray voltage regarding the property.

D.    *First Trial and Appeal*

As we described in more detail in *Wilson I, supra,* 234 Cal.App.4th 123, Wilson's claims for negligence, IIED, and nuisance were tried before a jury. In that trial, a significant amount of evidence was presented related to the history of stray voltage at 904 Knob Hill Drive and the surrounding neighborhood, much of which we set forth in our

statement of facts.[15] (*Id.* at pp. 132-135.) Wilson also presented a significant amount of evidence of various physical injuries she suffered, although she did not present evidence showing that these injuries were caused by her exposure to stray voltage. (*Id.* at pp. 139, 158.)

The jury found in favor of Wilson on all three of her claims, and awarded her $550,000 on her IIED and negligence claims, $500,000 on her nuisance claim, plus $3 million in punitive damages. (*Wilson I*, *supra*, 234 Cal.App. at p. 140.) Edison appealed, raising several contentions, including that Wilson's claims fell under the exclusive jurisdiction of the PUC. In our published decision, we concluded that the PUC did not have exclusive jurisdiction over the claims, but found there was insufficient evidence to support Wilson's IIED and negligence claims, and that the punitive damages award was unjustified. (*Id.* at p. 140.) We determined, however, that "[w]e cannot conclude there was insufficient evidence to support Wilson's nuisance claim, since it requires the jury to balance the gravity of the harm from the interference with Wilson's use and enjoyment of her property against the social utility of Edison's conduct." (*Id.* at p.151.) We nevertheless found that the nuisance claim could not stand because "the jury considered evidence of Wilson's physical injuries (which should not have

---

[15]     We note that Wilson, in her respondent's brief/cross-appellant's opening brief, recites this history "word-for-word and unadorned" from our opinion as part of her statement of facts. This is inappropriate. Our statement of facts in *Wilson I* was based upon the evidence presented at the first trial (which included other claims for which the historical evidence was relevant). The only facts relevant to this appeal are the facts that were presented to the jury at the second trial.

been considered because there was no evidence those injuries were caused by her exposure to stray voltage) in balancing the harm against the social utility and finding in favor of Wilson." (*Id.* at pp. 151-152.) Therefore, we remanded the matter for retrial on the nuisance claim. (*Id.* at p. 160.) In doing so, we noted an issue regarding the jury instruction for that claim (CACI No. 2021), and directed the trial court to give an additional instruction to supplement CACI No. 2021. (*Id.* at pp. 160, 163-164.)

E. *Retrial*

On remand, the case was assigned to a different judge. The trial court entered judgment in favor of Edison on the negligence and IIED claims, ordered Wilson's claim for punitive damages stricken, and set the matter for trial on the nuisance claim.

Before trial, Edison filed several motions in limine, including motions to exclude all evidence and argument relating to (1) the alleged existence of stray voltage at any property other than Wilson's, or at Wilson's property before she owned it, or (2) Edison's prior ownership of Wilson's property (or other nearby houses) or its putting those houses on the market in the 1990s. The trial court granted those motions to the extent they sought exclusion of evidence related to other properties or to Edison putting Wilson's property on the market in the 1990s, but denied them to the extent they sought to exclude evidence related to the history of the property and its previous owners or tenants. In making its ruling, the court stated: "we need some context as to what Edison knew, when they knew it, what responses they took, and then how that

19

dovetails or compares with the action of Edison in the particular period involving Ms. Wilson."

In light of this ruling, Wilson presented a significant amount of evidence related to stray voltage issues encountered by previous owners or tenants of Wilson's property, as well as some evidence related to stray voltage issues throughout the neighborhood. This evidence included (1) testimony from a former tenant of the house about shocks she and her young children experienced when they lived there in 1995 to 1997; (2) testimony from a former longtime employee of the Southern California Gas Company about the gas company's issues with stray voltage both at Wilson's house and in the neighborhood; (3) testimony from a former employee in Edison's real estate department who was involved in preparing the property for sale between 1997 and 1999, who was subject to extensive questioning about his experience with stray voltage at the property during that time as well as the prior history of people experiencing stray voltage there; (4) testimony from the former facility coordinator for Edison, who was questioned about reports he received regarding former tenants getting shocked in the house when Edison owned the property; and (5) Norwalk's testimony on cross-examination regarding reports by prior owners or tenants of shocks they received at the property.

Wilson's attorney emphasized this evidence in his closing argument, criticizing Edison for failing to fix the problem, and asking the jury to send a message to Edison: "[T]he question is going to be whether Edison is going to get away with this. With your verdict, you can say no. You can say no, Edison, you are not going to get away with

20

telling people over and over and over again that they are safe, that you fixed it. . . . They [i.e., Edison] don't care. What your verdict can do is make them care."

During deliberations, the jury sent out two questions.

The first question asked for clarification on question No. 8 on the special verdict form–"Did the seriousness of the harm outweigh the public benefit of Southern California Edison's conduct?"–asking, "What is meant on the part stating public benefit? i.e., is it the street? Southern California?" After conferring with counsel, the court sent a written response to the jury stating, "Without a specific geographical location, the focus is on the public benefit of Edison's conduct in supplying electricity to its customers."

The second question asked, "In this case, what is the definition of harm? (i.e., mental? physical? financial?)" In response, the court referred the jury to the first two subdivisions of CACI No. 2022.[16]

The jury came back with a special verdict in favor of Wilson, awarding her $1.2 million in damages. The jurors were polled. On four

---

[16] CACI No. 2022 was added by the Judicial Council in response to *Wilson I, supra*, 234 Cal.App.4th at pages 163-164. As read to the jury, it provided in relevant part: "In determining whether the seriousness of the harm to Simona Wilson outweighs the public benefit of Southern California Edison's conduct, you should consider a number of factors. To determine the seriousness of the harm Simona Wilson suffered, you should consider the following: [(a)] The extent of the harm, meaning how much the condition Southern California Edison caused interfered with Simona Wilson's use or enjoyment of her property and how long that interference lasted; [(b)] The character of the harm, that is, whether the harm involved a loss from the destruction or impairment of physical things that Simona Wilson was using[,] or her personal discomfort or annoyance." (See CACI No. 2022.)

21

critical questions–(1) did Edison create a condition that was an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life or property; (2) was this condition of such duration, nature, or amount as to have unreasonably interfered with Wilson's use or enjoyment of her land; (3) was Edison's conduct a substantial factor in causing Wilson harm; and (4) did the seriousness of the harm outweigh the public benefit of Edison's conduct–the jury was split nine to three.

Judgment was entered in favor of Wilson and against Edison in the amount of $1.2 million.  Edison filed motions for a new trial and for judgment notwithstanding the verdict (jnov), and Wilson filed a motion for attorney fees.

In its new trial motion, Edison submitted the declarations of two jurors (one of whom voted in favor of Wilson) stating that the jury discussed and considered compensating Wilson for the value of her house, the damage to her credit, and her attorney fees, and agreed to a $1.2 million verdict based on these considerations.  Based upon those declarations, Edison argued there was jury misconduct entitling it to a new trial.  Edison also argued it was entitled to a new trial on the grounds that (1) the damages award was excessive; (2) there was insufficient evidence to support the damage award; (3) there was insufficient evidence to support a finding of liability; and (4) the court committed prejudicial error by admitting evidence related to the history of Wilson's property before she owned it.  In its motion for jnov, Edison argued there was no substantial evidence to support the verdict because the evidence does not support that Wilson suffered "substantial actual

damage" or that the gravity of any harm she suffered outweighs the social utility of Edison's distribution of electricity.

In her attorney fee motion, Wilson argued she was entitled to fees under section 1021.5 because she ultimately prevailed on an issue of broad public importance, i.e., whether the PUC had exclusive jurisdiction over claims related to stray voltage, and the cost to Wilson of litigating against Edison was disproportionate to her personal stake in the outcome of her case. She requested an award of over $3 million (a lodestar of just over $1 million, with a multiplier of three). This figure included her fees from both the first and the second trials, as well as the prior appeal.

The trial court denied all three motions. Edison timely filed a notice of appeal from the judgment and denial of its posttrial motions, and Wilson timely filed a notice of cross-appeal from the denial of her attorney fee motion.

## DISCUSSION

A.    *Law Governing Private Nuisance Claims*

A private nuisance claim is a claim for "a nontrespassory interference with the private use and enjoyment of land." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 937 (*Covalt*).) As our Supreme Court has explained, it requires proof of three elements.

First, the plaintiff must prove an "interference with the plaintiff's use and enjoyment of that property." (*Covalt, supra,* 13 Cal.4th at p. 937.)

23

Second, the plaintiff must prove "that the invasion of the plaintiff's interest in the use and enjoyment of the land was *substantial*, i.e., that it caused the plaintiff to suffer 'substantial actual damage.' . . . The degree of harm is to be judged by an objective standard, i.e., what effect would the invasion have on persons of normal health and sensibilities living in the same community? [Citation.] 'If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one, even though the idiosyncracies of the particular plaintiff may make it unendurable to him.' [Citation.] This is, of course, a question of fact that turns on the circumstances of each case." (*Covalt*, *supra*, 13 Cal.4th at p. 938.)

Third, "'[t]he interference with the protected interest must not only be substantial, but it must also be *unreasonable*' [citation], i.e., it must be 'of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land.' [Citations.] The primary test for determining whether the invasion is unreasonable is whether the gravity of the harm outweighs the social utility of the defendant's conduct, taking a number of factors into account.[17] [Citation.] Again the standard is objective: the question is

---

[17] Those factors were spelled out in *Wilson I*, and are incorporated in CACI No. 2022 as follows:

"To determine the seriousness of the harm [*name of plaintiff*] suffered, you should consider the following:

"a. The extent of the harm, meaning how much the condition [*name of defendant*] caused interfered with [*name of plaintiff*]'s use or enjoyment of [his/her] property, and how long that interference lasted.

24

not whether the particular plaintiff found the invasion unreasonable, but 'whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable.' [Citation.]  And again this is a question of fact:  'Fundamentally, the unreasonableness of intentional invasions is a problem of relative values to be determined by the trier of fact in each case in light of all the circumstances of that case.' [Citations.]" (*Covalt, supra,* 13 Cal.4th at pp. 938-939.)

---

"b.  The character of the harm, that is, whether the harm involved a loss from the destruction or impairment of physical things that [*name of plaintiff*] was using, or personal discomfort or annoyance.

"c.  The value that society places on the type of use or enjoyment invaded.  The greater the social value of the particular type of use or enjoyment of land that is invaded, the greater is the seriousness of the harm from the invasion.

"d.  The suitability of the type of use or enjoyment invaded to the nature of the locality.  The nature of a locality is based on the primary kind of activity at that location, such as residential, industrial, or other activity.

"e.  The extent of the burden (such as expense and inconvenience) placed on [*name of plaintiff*] to avoid the harm.

"To determine the public benefit of [*name of defendant*]'s conduct, you should consider:

"a.  The value that society places on the primary purpose of the conduct that caused the interference.  The primary purpose of the conduct means [*name of defendant*]'s main objective for engaging in the conduct.  How much social value a particular purpose has depends on how much its achievement generally advances or protects the public good.

"b.  The suitability of the conduct that caused the interference to the nature of the locality.  The suitability of the conduct depends upon its compatibility to the primary activities carried on in the locality.

"c.  The practicability or impracticality of preventing or avoiding the invasion."  (CACI No. 2022; see also *Wilson I, supra,* 234 Cal.App.4th at pp. 163-164.)

The Supreme Court noted that the latter two elements "flow[] from the law's recognition that 'Life in organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms. It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together. The very existence of organized society depends upon the principle of "give and take, live and let live," and therefore the law of torts does not attempt to impose liability or shift the loss in every case in which one person's conduct has some detrimental effect on another. Liability for damages is imposed in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation.' [Citation.]" (*Covalt*, *supra*, 13 Cal.4th at pp. 937-938.)

A finding of an actionable nuisance does not require a showing that the defendant acted unreasonably. As one treatise noted, "[c]onfusion has resulted from the fact that the intentional interference with the plaintiff's use of his property can be unreasonable even when the defendant's conduct is reasonable. This is simply because a reasonable person could conclude that the plaintiff's loss resulting from the intentional interference ought to be allocated to the defendant." (Prosser & Keeton, Torts (5th ed. 1984) § 88, p. 629.)

26

B.    *Judgment as a Matter of Law*

Edison contends on appeal that it is entitled to judgment because the tingling sensation Wilson felt, which could have been remedied for $5,000, cannot constitute a nuisance when weighed against the public benefit of Edison's conduct, i.e., providing electricity to the community. In making this argument, Edison defines the claimed nuisance as "a slight tingling sensation caused by stray voltage," and asserts that "Wilson's annoyance over the stray voltage was only reasonable–and so was only actionable–to the extent that the stray voltage was *perceptible*."

Edison's argument fails at its definition of the claimed nuisance in this case. As litigated by Wilson, the claimed nuisance–i.e., the allegedly unreasonable interference–was the presence of stray voltage on her property, whether perceptible or not. As she repeatedly stated, it was not sufficient to eliminate the perceptible voltage by bonding the showerhead to the drain or adding isolators; she wanted the stray voltage eliminated entirely. Thus, the alleged harm she suffered was not limited to the tingling sensation she felt in the master bathroom shower–or the shock she felt in June or July 2011 while using the outside shower. Based upon the evidence presented at trial, the jury could also find that Wilson suffered harm caused by the stray voltage even when it was not perceptible.

For example, Wilson's expert testified that he went to Wilson's house and took voltage measurements, and measured three volts from the plumbing in the kitchen sink to the wet floor. Thus, even though Wilson had never perceived electricity at the kitchen sink, the jury

27

could conclude that a reasonable person would be annoyed or disturbed by the unperceived stray voltage. That this might be characterized as fear of a future injury does not mean that it cannot be considered an alleged harm for purposes of a private nuisance claim if the jury determines that that fear was reasonable. (See *McIvor v. Mercer-Fraser Co.* (1946) 76 Cal.App.2d 247, 254 ["mere apprehension of injury from a dangerous condition may constitute a nuisance where it interferes with the comfortable enjoyment of property"].)

Edison's reliance on *Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994) 24 Cal.App.4th 1036, for the proposition that fear of a future injury is insufficient to support a nuisance claim is misplaced. In that case, the plaintiffs–owners of commercial units in an industrial park located on the border of an airport–alleged that the location and construction of a jet fuel farm at the airport 100 feet from their property interfered with the use and enjoyment of their property because it caused them to fear a catastrophic accident from an aircraft accident or rupture of the fuel tanks. (*Id.* at p. 1039.) The appellate court held that this was insufficient to state a cause of action for private nuisance. It noted that "[i]n this state . . . a private nuisance action cannot be maintained for an interference in the use and enjoyment of land caused solely by the fear of a future injury." (*Id.* at pp. 1041-1042.) The plaintiffs' nuisance claim failed in that case because there had been no actual physical invasion or damage to them or their property. (*Id.* at p. 1042.)

In contrast, in this case there is an ongoing physical invasion of Wilson's property–there is no dispute that there is stray voltage affecting her entire property. Moreover, there is no dispute that the stray voltage has, at times, been perceptible, causing a tingling sensation or a shock. Thus, if a jury concluded that a reasonable person would fear further encounters with perceptible stray voltage, it could find that that fear substantially interfered with Wilson's use and enjoyment of the property.

A jury also might find other kinds of harm caused by imperceptible stray voltage, such as limits on what could be done in a further remodel. As Norwalk counseled Seamons when they met to discuss the stray voltage at the property, Seamons would need to consult with Edison before doing renovations that involve plumbing to discuss what would need to be done to prevent perceptible stray voltage.

In identifying these possible harms, we do not mean to imply that the invasion Wilson alleges *necessarily* is substantial and that the harm she allegedly suffered outweighs the public benefit of Edison's provision of electricity. That is for a jury to decide. We simply point them out to demonstrate that the balancing that Edison contends favors it as a matter of law is not as simple as Edison makes it out to be. In light of the evidence presented at trial, we cannot conclude *as a matter of law* that Edison is entitled to judgment.

C.   *Admission of Evidence Regarding Prior Owners/Tenants and Other Properties*

As noted, before trial Edison moved to exclude evidence regarding stray voltage incidents at houses other than Wilson's house, or incidents that occurred at Wilson's house before Wilson bought the property. Edison argued that this evidence was not relevant to Wilson's nuisance claim because "any liability of [Edison] for nuisance must be based upon an interference with [Wilson's] use and enjoyment of [*Wilson's*] *Property during the time that she owned the property*." The trial court denied Edison's motion with respect to incidents at Wilson's house, finding the evidence was relevant to show what Edison knew, when it knew it, and how it responded in the past.[18] On appeal, Edison contends the trial court erred in admitting this evidence, and that the admission of the evidence prejudiced Edison. We agree.

1.   *Most of the Evidence Was Not Relevant to the Nuisance Claim*

"'No evidence is admissible except relevant evidence.' (Evid. Code, § 350.) "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) 'The test of relevance is whether the evidence tends "'logically, naturally, and by

---

[18]   Although the trial court granted the motion with regard to incidents involving properties other than Wilson's, some evidence nevertheless was allowed in during trial.

reasonable inference' to establish material facts. . . .'" [Citation.]  A trial court 'is vested with wide discretion in determining the relevance of evidence,' but it has 'no discretion to admit irrelevant evidence.' [Citation.]"  (*Velasquez v. Centrome, Inc.* (2015) 233 Cal. App. 4th 1191, 1211.)

Wilson contends the evidence regarding the history of stray voltage at her property and other nearby properties is relevant to (1) notice as it relates to the element of unreasonableness; (2) the existence of a nuisance; (3) causation; and (4) why Wilson refused to accept Edison's offer to install isolators at her showers and gas line. She misunderstands the elements of a nuisance claim and ignores the facts of this case.

To prove her nuisance claim, Wilson has to prove (1) Edison's conduct caused an interference with *her* use and enjoyment of the property; (2) that the interference was substantial, i.e., that it caused *her* to suffer substantial actual damage; and (3) that the interference was unreasonable, i.e., that it was of such a nature, duration, or amount as to constitute unreasonable interference with *her* use and enjoyment of the land.  (*Covalt, supra,* 13 Cal.4th at pp. 937-938.)

Wilson's first argument–that evidence of other people's experience with stray voltage on the property (or other nearby properties) is relevant to notice as it relates to the element of unreasonableness–is based upon a faulty reading of the element.  Wilson contends that "any and all evidence probative of the reasonableness of Edison's conduct is admissible."  But the issue to be decided in a nuisance case is not the reasonableness of the defendant's conduct.  A defendant's conduct may

be reasonable but still result in an unreasonable interference with the plaintiff's use and enjoyment of her property.[19] (Prosser & Keeton, *supra*, § 88, p. 629.) In any event, the conduct at issue is the conduct that causes the interference with *Wilson's* use and enjoyment of her property. Edison's conduct with regard to prior occupants of the house has no relevance to this issue.

Wilson's second argument–that the evidence at issue is relevant to show the existence of a nuisance–is difficult to decipher. Relying upon product defect and negligence cases, Wilson appears to argue that evidence of similar occurrences in the past tend to establish that the defendant had notice of a defect. She contends that Edison "hotly contested the existence of a nuisance," and the challenged evidence had a tendency to refute that because it showed that Edison had received a "constant stream of complaints" regarding stray voltage in the neighborhood but did nothing about it until it was forced to.[20] But the only nuisance whose existence is contested in this case is the private nuisance Wilson alleged, i.e., that stray voltage caused by Edison unreasonably interfered with *Wilson's* use and enjoyment of her

---

[19]    The reasonableness of Edison's conduct might be relevant to a negligence claim, but we previously found there was insufficient evidence to support such a claim against Edison. (*Wilson I, supra,* 234 Cal.App.4th at p. 140.)

[20]    We note that this latter argument–that Edison had notice of prior complaints but did nothing until it was forced to–is not a proper argument on a nuisance claim. Rather, it is an argument for a negligence claim for which, as noted, we previously found there was insufficient evidence. (*Wilson I, supra,* 234 Cal.App.4th at p. 140.)

32

property. Whether Edison had notice of similar alleged complaints of stray voltage made at other times or with regard to other places is not relevant to establish an alleged nuisance in *this* case.

In Wilson's third argument, she contends that evidence of similar conditions in the neighborhood and of similar complaints in the past is relevant to show that the harm she suffered was from the same cause. Even if this were true, it ignores the fact that the cause of the interference with Wilson's property was not contested in this case. While Edison may have contested (and continues to contest) that the interference rises to the level of a nuisance under the law, it has never contested that the stray voltage at Wilson's property is caused by its conduct in transmitting and distributing electricity to the area.

In her final argument, Wilson contends that the challenged evidence was relevant because her "knowledge of Edison's treatment of all the prior occupants of her house regarding stray electricity . . . was a factor in her refusing to move back into the house based on Edison saying they would finally fix it . . . –or at least the jury could so find." But there is no evidence that this was a factor in her decision not to move back into the house. Rather, Wilson testified that she refused to move back into the house because she had signed a one-year lease on a rental property and because she considered Edison's proposed fix a "band-aid" rather than a real solution since it would not completely eliminate the stray voltage on her property. Moreover, it appears that Wilson did not have any of the detailed evidence presented at trial when she made her decision; she testified that Norwalk told Stelle about the history of stray voltage at the property but did not provide

any specifics, and that she asked for more detailed information from Edison, but never received it.

Although this last argument fails to show that the extensive evidence of prior stray voltage incidents that was presented at trial was relevant to Wilson's nuisance claim, it does suggest that there could be some relevance to a small subset of that evidence. Evidence of *Wilson's knowledge* of those incidents at the time she filed her lawsuit and moved out of the house with the intent not to return could be relevant to the extent that knowledge contributed to any fear of future incidents she experienced. The rest of the evidence regarding those incidents and incidents involving other properties, however, was irrelevant, and the trial court erred by allowing that evidence to be admitted.

2. *Admission of the Evidence Prejudiced Edison*

Error in the admission of evidence is reversible only if it prejudiced Edison, i.e., if "there is a 'reasonabl[e] probab[ility]' that it affected the verdict." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) "A 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.'" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682.) We find there is a reasonable chance that a result more favorable to Edison would have been reached had the challenged evidence been excluded.

First, the prior history of stray voltage on Wilson's property was raised throughout the trial, from Wilson's opening statement, through

34

several witnesses who testified solely about that history, to closing argument.

Second, Wilson's counsel used that evidence extensively in his closing argument, contending that Edison had acted improperly for decades and asking the jury to send Edison a message through its verdict.

Finally, this was a close case. The jury split nine to three on four key questions. It is reasonably probable that one or more additional jurors would have found in favor of Edison on those questions in the absence of the challenged evidence.

Because we find that Edison was prejudiced by the admission of irrelevant evidence, we reverse the judgment in favor of Wilson and remand the matter for a retrial on the nuisance claim. On retrial, the evidence regarding prior stray voltage incidents at Wilson's property or neighboring properties is inadmissible except to the extent the evidence relates to Wilson's knowledge of those incidents at the time she filed the lawsuit and moved out of the house with the intent not to return and that knowledge contributed to the harm she allegedly suffered.

D.   *Other Issues Raised*

In light of our determination that the judgment must be reversed and the matter remanded for retrial, we need not address the other issues Edison raises in its appeal. And, because the judgment is

35

reversed, Wilson no longer is the prevailing party.  Therefore, her cross-appeal challenging the denial of her motion for attorney fees is moot.[21]

## DISPOSITION

The judgment is reversed and the matter is remanded for retrial on the nuisance cause of action.  Wilson's cross-appeal is dismissed as moot.  Edison shall recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, Acting P. J.


We concur:



MANELLA, J.



COLLINS, J.

---

[21]     Edison filed a request for judicial notice relating to the cross-appeal.  In light of our finding that the cross-appeal is moot, we deny that request.